[No. H026841. Sixth Dist. Dec. 4, 2007.]

MICHAEL SCHMIDLIN, Plaintiff and Appellant, v.
THE CITY OF PALO ALTO et al., Defendants and Appellants.

Counsel

Mark Martel for Plaintiff and Appellant.

Gary M. Baum, City Attorney, William B. Mayfield and Donald A. Larkin, Assistant City Attorneys, for Defendants and Appellants.

## Opinion

**RUSHING, P. J.**—Plaintiff Michael Schmidlin brought this action against the City of Palo Alto and several of its police officers, alleging that the officers committed various constitutional and common law torts when they detained and arrested him for public drunkenness. After various claims were dismissed on legal grounds, a jury found that officers had used excessive force against plaintiff, but rejected claims of unlawful arrest and fabrication of police reports. Both parties appeal on numerous grounds. We find no reversible error, and affirm the judgment.[1]

### Background

According to plaintiff, he and two companions, Jim Walker and Bill D'Honau, were walking along a downtown Palo Alto street in the early morning hours of March 29, 1997, when they were accosted by two young women in a car driving the wrong way on the street. As plaintiff tried to persuade the women not to drive in their condition, defendant Bertrand Milliken, a Palo Alto police officer, arrived in his patrol car. Thinking the women were about to be arrested, plaintiff began to walk away. His companions, however, remained behind to watch, so plaintiff turned and waited for them near a sign. Plaintiff and his companions testified that plaintiff was not drunk and did not appear drunk.

Milliken testified that plaintiff staggered drunkenly to the sign, where he appeared to be urinating. He approached plaintiff to investigate. Plaintiff was not urinating, but Milliken asked him for identification anyway. Plaintiff balked at this, and told Milliken he had left his identification in his truck. Plaintiff and his companions told Milliken they were on their way home. Milliken conceded that they told him they were just walking down the street a few blocks and that Walker and D'Honau said they were with plaintiff. Milliken testified that plaintiff appeared drunk, and that soon after their

---

[1] In a related appeal, *Schmidlin v. City of Palo Alto* (Dec. 4, 2007, H027685) (nonpub. opn.), we reverse the trial court's award of attorney fees on the ground that the court failed to employ the required methodology for calculating such an award.

exchange began, plaintiff became hostile, put his face close to Milliken's, and seemed to be going to fight him. According to Milliken, plaintiff started to walk away several times, whereupon Milliken ordered him to remain. Plaintiff and his companions denied this, though Walker testified that plaintiff averted his gaze at one point and plaintiff testified that he stepped back as Milliken got extremely close to him.

At least four and a half minutes after approaching plaintiff, Milliken placed a nonurgent call for backup. In response, defendant Officer Martin drove to the scene. When he arrived, Milliken told plaintiff he was under arrest. Without warning, according to plaintiff and his companions, the officers grabbed plaintiff's arms and threw him face first to the ground, both landing on top of him. Plaintiff testified that Martin then began punching him, grabbing his head by the hair and jamming it into the sidewalk, producing cuts and abrasions on his face. A third officer, defendant Trujillo, ran up and hit plaintiff on the legs with a baton.

Plaintiff's companions Williams and D'Honau complained at the scene about his treatment, and a police sergeant, defendant Carole Baldwin, arrived to speak to them. Although her report indicated that they were upset about the officers' treatment of plaintiff, they testified that she attributed to them statements they did not make, and omitted statements they did make.

After plaintiff's arrest, officers took him to Stanford Hospital for an assessment of his injuries. Plaintiff said that officers refused to let him use the bathroom at this time, but defendant Milliken told plaintiff he could use the bathroom if he would provide a urine sample. Plaintiff agreed, although he did not want to provide a urine sample because, he testified, he feared officers might tamper with it. After using the bathroom, he presented a sample cup filled with water. When he went to the bathroom a second time, defendants Milliken and Martin followed him and, according to plaintiff, threw him to the floor and elbowed and kneed him.

Plaintiff was subsequently charged with a number of misdemeanors, as more fully described below. (See p. 741, *post.*) During the course of the criminal prosecution he made a motion to suppress evidence, alleging that Officer Milliken had lacked sufficient grounds to conduct an investigatory detention, and that all evidence flowing from that detention should be excluded. That motion was denied, and plaintiff was tried in January 1999 on charges of resisting arrest, public intoxication, false identification, assault on a police officer (Martin), and battery on a police officer (Milliken). The jury found him guilty of false identification and not guilty of public drunkenness and assault, but failed to reach a verdict on resisting arrest and battery. Plaintiff successfully moved for a new trial on the false identification charge

based on instructional error and juror misconduct. After announcing an intention to retry the remaining charges, the prosecutor dismissed them on the eve of trial.

On December 12, 2000, plaintiff brought this action against Officers Milliken, Martin, Trujillo, and Baldwin, the Palo Alto Police Department, and the City of Palo Alto. Defendants brought a motion for summary judgment, arguing among other things that the denial of plaintiff's suppression motion precluded him from pursuing his claims for unlawful detention and arrest, and that the statute of limitations barred the claims for excessive force. The court denied the motion.

The matter came on for trial, and after proceedings described more fully below, the jury found that Officers Milliken, Martin, and Trujillo had violated plaintiff's constitutional rights by using excessive force against his person. The jury rejected his claims of false arrest and fabrication of police reports. The trial court denied defendants' motion for judgment notwithstanding the verdict. Defendants, followed by plaintiff, filed timely notices of appeal.

## I. Defendants' Appeal

### A. Sufficiency of Evidence of Excessive Force

Defendants assert that the evidence was insufficient to support the jury's finding of excessive force. At least we so construe their brief, which alludes in passing to the insufficiency of the evidence, but which is actually devoted almost entirely to rearguing the facts. This approach disregards the fundamental principles governing appellate review of factual findings, and the "daunting burden" those principles impose upon an appellant who challenges the sufficiency of the evidence to support a judgment. (*In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328–329 [249 Cal.Rptr. 798].) " 'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.' [Citations.]" (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881].)

Defendants state that "even assuming the version of events most favorable to [plaintiff], the force used to arrest him and to control him while in custody was not constitutionally excessive." But defendants nowhere set forth the

version of events most favorable to plaintiff, although doing so is part of their fundamental obligation to this court, and a prerequisite to our consideration of their challenge. "A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]" (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 208 [249 Cal.Rptr. 743], italics added.) Where a party presents only facts and inferences favorable to his or her position, "the contention that the findings are not supported by substantial evidence may be deemed waived." (*Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 832 [227 Cal.Rptr. 1].)

■ In addition to neglecting these requirements, defendants' brief pervasively alludes to factual matters unaccompanied by record citations.[2] It is the duty of counsel to refer us to the portion of the record supporting his contentions on appeal. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 589, p. 624; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 [35 Cal.Rptr.2d 574]; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108 [75 Cal.Rptr.2d 27]; see *People v. Hyatt* (1971) 18 Cal.App.3d 618, 624 [96 Cal.Rptr. 156] [where brief fails to specify portions of record supporting appellant's factual assertions, record is presumed to support trial court's rulings].) "It is not incumbent upon this court to search a record of this character to determine a point raised in this manner." (*Erro v. City of Santa Barbara* (1932) 123 Cal.App. 508, 513 [11 P.2d 890]; see *In re Marriage of Fink, supra*, 25 Cal.3d at p. 888 ["It is neither practical nor appropriate for us to comb the record on [the appellant's] behalf"].)

Even overlooking these deficiencies, we find defendants' challenge to the sufficiency of the evidence unpersuasive. Defendants assert as a "paramount and indisputable fact" that when officers threw plaintiff to the ground he was "so intoxicated that he presented a danger to himself and others," and as "an objective fact" that "the arresting officers faced a severely intoxicated individual . . . ." But the supposed facts cited for this characterization are that (1) plaintiff had five beers over a period of six hours, and (2) plaintiff professed to be unable to "dispute Agent Milliken's observations that he had red and glassy eyes and a strong odor of alcohol, because these are observations uniquely observable only by someone other than himself." The weight to be assigned to these reported observations was for the jury, not this court, and even if they were credited at face value they would hardly establish beyond peradventure that plaintiff was "severely intoxicated" or that he presented any occasion for the use of force.

---

[2] For example, "Schmidlin and his excessive force expert witness Frank Saunders contended that it was excessive force to take Schmidlin to the ground in order to place him in handcuffs." And, "[a]s testified to by the officers, the threat to officer safety posed by such an intoxicated individual being placed under arrest is unpredictable but potentially severe."

Defendants similarly assert, without record citations, that plaintiff exhibited an "uncooperative and resistive attitude toward complying with the officers' commands." Accepting this fact, even coupled with plaintiff's consumption of five beers over six hours, would hardly oblige the jury to find that officers were entitled to throw plaintiff to the ground, pile on top of him, grind his face into the sidewalk, and beat his legs with a baton. Worse, defendants rely on Officer Milliken's paraphrased testimony that plaintiff "repeatedly tried to walk away to avoid questioning and eventually squared off in a tense stance when the way was blocked," even while acknowledging that plaintiff "denied this entirely." For purposes of the issue tendered by defendants, plaintiff's denial is *presumed to be true* because it supports the judgment; contrary testimony is all but irrelevant.

Defendants' brief continues in this vein, alluding to and arguing from supposed evidence, almost none of which is supported by record citations. Plaintiff points all this out in his responding brief. Defendants do not meet the point in their reply brief, but continue in the same manner. Thus they belatedly acknowledge plaintiff's testimony that drinking five or six beers over an evening would not make him feel excessively intoxicated, or affect his ability to walk or talk, but would just leave him feeling mellow and relaxed; but they assert that this evidence "must be disregarded in examining the constitutionality of the level of force employed to effect his arrest because they attest to an alleged mental state rather than objective indications of intoxication." On the contrary, plaintiff's testimony about his reactions to alcohol, which the jury presumptively credited at least to the extent that it left him feeling "mellow," would support an inference that he posed no threat to officers whatever, and that any evidence to the contrary was not true. Plaintiff's brief includes a nine-page catalog of other evidentiary details— fully backed by citations to the record—supporting the verdict but absent from defendant's presentation. This catalog confirms that the present case is a prime candidate for application of the rule that failure to present a full and fair summary of the evidence *supporting* the judgment effects a "waive[r]" of any challenge to the sufficiency of the evidence. (*Oliver v. Board of Trustees*, *supra*, 181 Cal.App.3d at p. 832.) In any event, depending as it does on disputed facts and inferences, defendant's presentation is insufficient to impeach the judgment.

B. *Qualified Immunity*

Defendants raise several arguments to the effect that the trial court erred in not sustaining their defense of qualified immunity. As with the challenge to the evidence of excessive force, their appellate presentation is so fundamentally flawed that it is unnecessary to delve into the applicable substantive law.

Their first argument is that the trial court should not have let the case go to the jury, or should have granted judgment notwithstanding the verdict, because "there was no evidence upon which the jury (or the trial court) could conclude that an objectively reasonable officer absolutely could not believe that the 'take-down' approach was a reasonably necessary and effective technique for handcuffing an intoxicated, uncooperative, and potentially dangerous individual." That formulation rests on factual premises that defendants have failed to establish for purposes of this appeal, and that appear to be contrary to what the jury was entitled to find, i.e., that plaintiff did *not* appear sufficiently intoxicated, uncooperative, or potentially dangerous to permit a reasonable officer to believe it was reasonably necessary to knock him down, strike, and club him. Once again defendants' argument is offered in defiance of the substantial evidence rule and the appellate presumption of correctness.

Defendants also assert that the trial court erred in instructing the jury that "it was clearly established law at the time of plaintiff's arrest that excessive force could not be used to effect an arrest." The nature of the claimed error eludes us. The ensuing argument addresses the question, not whether an officer might have thought it was permissible to use excessive force at the time of plaintiff's arrest, but whether it was established law that *the force used* by the officers *was excessive*. Obviously the two questions differ markedly. As far as it went, the challenged instruction was a correct statement of law. If defendants have a grievance, it must be that the court committed some error in instructing on *what constituted* excessive force under established law. Defendants make no effort to identify such an error, shifting instead to an argument that plaintiff failed to carry his burden of showing that established law at the time prohibited the conduct attributed to defendant officers. In the absence of a proper showing to this effect, we presume in support of the judgment that the evidence supported a contrary determination. Further, the argument again rests on controverted, unsubstantiated, and presumptively rejected factual assertions, e.g., that plaintiff was a "physically resistive suspect" engaged in "vigorous physical resistance to handcuffing"; that an officer pressed his forearm against plaintiff's head rather than, as plaintiff testified, pulling his hair; and that officers' attack on plaintiff at the hospital served "the legitimate police purpose of preventing another falsified urine sample which would delay medical clearance."[3] A challenge thus poisoned by controverted factual premises presents no legal issue to decide. It is on its face devoid of merit.

---

[3] According to plaintiff, who unlike defendants supports his factual assertions with record citations, there was evidence before the jury that getting a urine sample was not part of the officers' duties; that a sample was not needed for medical clearance; that plaintiff was under no obligation to provide a sample; and that despite this complete absence of justification, officers "pulled him out of the bathroom as he was about to use it; threw him on the floor; and kneed and elbowed him as he was being handcuffed."

## C. *Statute of Limitations*

### 1. *Background*

Defendants contend that plaintiff's excessive force claim was barred by the statute of limitations. Defendants did not raise this issue during trial, but asserted it before trial by motion for summary judgment, and again after trial by motion for judgment notwithstanding the verdict. The trial court rejected it on both of those occasions. Defendants have failed to carry their burden of demonstrating that these rulings were incorrect.

It is undisputed that the officers' use of excessive force against plaintiff occurred on March 29, 1997. Plaintiff was arrested on that date, and was released from custody, apparently on bail, on March 30, 1997. A criminal complaint was filed on April 18, 1997, charging plaintiff with public intoxication (Pen. Code, § 647, subd. (f)) and resisting an officer in the discharge of his duties (Pen. Code, § 148, subd. (a)). The complaint was later amended to add charges including battery on a peace officer in the performance of his duties (Pen. Code, §§ 242, 243, subd. (b)), vandalism (Pen. Code, § 594, subds. (a), (b)(4)), and giving a false name to a police officer (Pen. Code, § 148.9). The matter went to trial in January 1999, resulting in an acquittal of public intoxication and assault on Officer Martin, a conviction for false identification, and a hung jury on resisting arrest and battery against Officer Milliken. Plaintiff's motion for a new trial on the false identification charge was granted on the ground that the jury had been prejudicially misinstructed. A new trial was scheduled for December 1999 on the charges of resisting arrest, battery, and false identification. On December 13, 1999, however, the prosecutor dismissed the remaining charges.

Plaintiff filed this action on December 12, 2000.

### 2. *Procedural Framework*

Before reaching the merits of the limitations issue we must address the premise, on which the dissent pervasively relies, that the only question properly before us is whether the trial court erred in denying defendants' motion for summary adjudication. According to the dissent, defendants were "entitled to prevail on [their] summary adjudication motion asserting that the statute of limitations barred Schmidlin's federal excessive force cause of action . . . ." (Dis. opn., *post*, at pp. 780–781.)

Other potential objections to this view aside, our adoption of it is precluded by two seemingly insurmountable obstacles: (1) defendants have expressly disclaimed any such claim of error, and (2) they never made a motion to

adjudicate the "federal excessive force cause of action." They did move for summary adjudication, but the motion as made was insufficient *on its face* to justify the order the dissent says the trial court should have made. Accordingly, the dissent misses the mark insofar as it concentrates on supposed error in the denial of summary judgment.

Defendants have explicitly disclaimed any attempt to predicate reversal of the present judgment on error in the trial court's ruling on their motion for summary judgment. True, in their opening brief they asserted, without citation of authority, that "an erroneous reason formed the basis for the pretrial denial of summary judgment . . . ." But they did not claim a right to reversal on that basis; rather, they focused on the court's denial of judgment notwithstanding the verdict. By the time of their reply brief this focus was exclusive. They there defined the governing question as, "Did the trial court err in *denying Defendant[s'] motion for judgment notwithstanding the verdict* on the issue of the statute of limitations bar?" (Italics added.) They went on to explicitly disclaim any contention that reversible error could be predicated on the summary judgment ruling, stating, "Schmidlin's Combined Brief mischaracterizes Defendant[s'] appeal on the statute of limitation issue as an appeal from the denial of summary judgment. [Record citation.] Defendants are appealing from the denial of JNOV and from the judgment, presenting on appeal the contention that the trial judge erred in denying JNOV and in entering judgment against defendants Milliken and Martin on the application of the statute of limitations to undisputed facts judicially noticeable in the record from the summary judgment proceedings." They reiterated this statement almost verbatim in supplemental briefing.

We would not hesitate to relieve defendants from an improvident concession in proper circumstances, but they have not requested such relief either expressly or by implication. Instead they have consistently sought an adjudication on the substantive merits of the limitations defense. There is simply no justification for the dissent's efforts to constrain the analysis of these issues within the procedural straitjacket of summary judgment procedure.[4]

---

[4] The dissent argues that defendants "implicitly" pursue the point they appear to have disclaimed. (Dis. opn., *post*, at pp. 784–785, fn. 5.) As discussed further below, the dissent's willingness to *impeach* the judgment under review by resuscitating a contention after it was discarded by its natural proponent seems particularly puzzling in light of its willingness to find that points raised by plaintiff in *defense* of the judgment have been procedurally forfeited.

Indeed, as a general matter the procedural rigor espoused by the dissent seems curiously selective. In some cases it appears to rest on a plain misapplication of the governing law. Thus the dissent seems to imply that plaintiff is stuck with not only the factual showing, but the *legal arguments* he made in opposition to defendants' summary judgment motion. The dissent implicitly finds that it would be " 'manifestly unjust' " to require defendants to meet new arguments (dis. opn., *post*, at p. 790, quoting *Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715]) though it is apparently considered entirely fair to reverse the judgment, without

Furthermore, even if the analysis were so constrained, an evenhanded application of summary judgment law would compel the conclusion that the trial court did not err in denying defendant's motion. Again, the dissent characterizes defendants' motion as one for "summary adjudication . . . asserting that the statute of limitations barred Schmidlin's *federal excessive force cause of action*." (Dis. opn., *post*, at p. 781, italics added.) Later the dissent again refers to "the City's motion for summary adjudication of the federal excessive force cause of action." (Dis. opn., *post*, at p. 783.) But defendants brought no such motion. As relevant to plaintiff's federal causes of action, they moved for "summary adjudication . . . on the . . . Seventh, Eighth, Ninth . . . Causes of Action . . . ." Plaintiff's claim for excessive force appeared in the portion of his complaint designated the seventh cause of action, as did most of his other federal claims. The central allegation of the seventh cause of action was that "Defendants unlawfully detained, arrested, and imprisoned plaintiff; used unreasonable and excessive force against against [*sic*] him; [and] testified falsely in their police reports and in court so that he would be charged and convicted of crimes he did not commit."[5]

■ By choosing to attack this allegation in its entirety, defendants lost any chance to secure the order the dissent insists should have been made. A

---

notice to plaintiff, based on arguments defendants have expressly abandoned. In any event, the rule invoked by the dissent, commonly known as "theory of trial" (see *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 [21 Cal.Rptr.2d 104] [" 'theory of the trial' "]), does not support its conclusion. In the cases cited by the dissent, that rule was invoked to shield a judgment from reversal, not to preclude new arguments in its support. (*Id.* at pp. 28–30; *Panopulos v. Maderis* (1956) 47 Cal.2d 337, 340–341 [303 P.2d 738]; *Ernst v. Searle, supra*, 218 Cal. at pp. 240–241.) Where a new theory is offered to *affirm* the judgment, as it manifestly is here, "the doctrine of theory of trial will often be disregarded." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 406, p. 457.)

Moreover, application of the doctrine is always discretionary with the reviewing court. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 406, p. 457.) The underlying rationale is that it is unfair to require the opposing party to refute new arguments, and especially new evidence, that it was not given an adequate opportunity to meet in the trial court. But here this factor weighs no more heavily against plaintiff, who neglected to present his new theory in opposition to summary judgment, than it does against defendants, who dropped the entire limitations defense until after trial, when it was too late for either side to present any new evidence to a finder of fact. Moreover, as discussed *post*, the way the parties litigated the matter below was heavily colored by federal case law that has since been abrogated. This also justifies a departure from the "theory of trial" rule. (9 Witkin, *supra*, Appeal, § 406, p. 458.) It seems to us that the balance of fairness does not favor either party; certainly it does not favor defendants. The dispositive consideration is therefore judicial efficiency. Since the only tenable alternative to affirmance is to reverse the matter and set it at large for a new trial, this factor strongly favors consideration of plaintiff's new theory on the merits.

[5] Plaintiff also alleged, in the eighth cause of action, that the defendants conspired to testify falsely about these matters in order to deprive plaintiff of his liberty, and in the ninth cause of action that they failed, among other things, to prevent plaintiff's "deprivation of liberty after his arrest." We find it unnecessary to consider whether these allegations add anything to the arguments against sustaining a limitations defense. Certainly they do not detract from them.

motion for summary adjudication tenders only those issues or causes of action specified in the notice of motion, and may only be granted as to the matters thus specified. The movant must "state[] specifically in the notice of motion and . . . repeat[], verbatim, in the separate statement of undisputed material facts," "the specific cause of action, affirmative defense, claims for damages, or issues of duty" as to which summary adjudication is sought. (Cal. Rules of Court, former rule 342(b); see now Cal. Rules of Court, rule 3.1350(b).) The motion must be denied if the movant fails to establish an entitlement to summary adjudication of the matters thus specified; the court cannot summarily adjudicate other issues or claims, even if a basis to do so appears from the papers. (See *Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542, 1546 [235 Cal.Rptr. 106] [" 'If a party desires adjudication of particular issues or subissues, that party must make its intentions clear in the motion. . . .' [Citation.] There is a sound reason for this rule: '. . . the opposing party may have decided to raise only one triable issue of fact in order to defeat the motion, without intending to concede the other issues. It would be unfair to grant a summary adjudication order unless the opposing party was on notice that an issue-by-issue adjudication might be ordered if summary judgment was denied' "].)

Here defendants' separate statement reflects no attempt to comply with this requirement. That alone precludes a holding that the trial court erred in denying the motion. Nor was the notice of motion sufficient to tender, as a distinct subject for summary adjudication, plaintiff's federal claim for excessive force. It prayed only for an adjudication of the entire seventh cause of action. Since that cause of action included several other alleged deprivations of constitutional rights, including false statements in police reports and in testimony at plaintiff's criminal trial, the motion as framed by defendants entitled them to *no* relief respecting plaintiff's excessive force claim unless they showed as a matter of law that *all* of the claims asserted in the seventh cause of action were unsustainable. Defendants were entitled either to summary adjudication on the *entire seventh cause of action*, or to no relief at all.

Defendants' motion fell well short of demonstrating an entitlement to judgment on all of plaintiff's federal claims. It essentially ignored at least one of them, namely, the claim based on false statements in police reports. Defendants did not establish the limitations defense, or any defense, as to that claim. Their separate statement of governing facts set out no facts concerning the date on which that claim would have accrued or otherwise laying a factual foundation for holding it barred. Their supporting memorandum ignored the claim altogether. It acknowledged plaintiff's somewhat similar claim "that the police officers gave *false statements in court testimony*," seeking to sweep it under the rug by noting that more than a year passed between the giving of that testimony and plaintiff's filing of suit. But they

wholly ignored the immediately adjacent allegation of a federal civil rights violation based upon false *police reports*.

The false reports claim obviously required a limitations analysis wholly distinct from the one applicable to the excessive force claim. For one thing, it could not have arisen on the night of plaintiff's arrest, when the excessive force claim did. No claim based on false statements could exist until the false statements were made. And such a claim would presumably not accrue—the limitations period would not begin to run—until plaintiff knew or had reason to know " 'of the injury which is the basis of the action.' " (*Lavellee v. Listi* (5th Cir. 1980) 611 F.2d 1129, 1131.) Plaintiff could not know of any injuries resulting from the false statements in police reports, or anywhere else, until he knew or had reason to know that those statements had been made.

Defendants's failure to address these issues, either factually or legally, does not appear inadvertent. Rather the record affirmatively suggests that they were not in a position to carry their burden of establishing an entitlement to summary adjudication on the false statements claim. The only relevant evidence then before the trial court was the declaration by plaintiff's counsel, who stated—in a paragraph partially quoted by the dissent—that he began requesting copies of police reports "[w]ithin a few weeks after Mr. Schmidlin's arrest," but was only able to obtain them "after the District Attorney filed charge[s]." The apparent meaning of this averment is that plaintiff (or his counsel) did not see the police reports, and could not have known of any false statements in them, until some time after the district attorney filed charges— presumably a reference to the criminal complaint filed on April 18, 1997. It is beyond dispute that under Government Code section 945.3 (section 945.3), discussed at length in the following parts, plaintiff was disabled from filing suit, and the statute of limitations was tolled, commencing no later than that date. This effect extended to any claim "based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating *or reporting* the offense . . . ." (§ 945.3, italics added.) It thus affirmatively appears from the papers before the court on summary judgment that the claim for false police reports did not accrue until sometime after plaintiff's right to sue was abated, and the limitations period tolled, by section 945.3. Certainly defendants did not show otherwise—or even attempt to do so.

Nor did defendants offer any other basis—any ground distinct from the limitations defense—to dispose of the false reports claim. Aside from their blanket assertion of the statute of limitations, their only arguments in their moving papers were that all federal claims predicated on the *unlawfulness of plaintiff's arrest* were barred by collateral estoppel; that the claim based on "perjury *at trial*" was barred by absolute immunity; that "supervisory liability" could not properly be imposed upon *Sergeant Baldwin*; that liability for

plaintiff's *arrest* was barred by qualified immunity; and that no evidence supported the imposition of *"entity liability"* upon the city and the Department. (Italics added.)

Indeed, defendants did not acknowledge plaintiff's false reports claims at all until their reply memorandum, which was of course too late to make the showing required of a moving party on summary judgment. Even there they relied entirely on obfuscation, writing, "Schmidlin's federal claims for false testimony in police reports and in court [Complaint ¶ 67] and conspiracy to give false testimony [Complaint ¶ 71] must have accrued at or before the January 1999 trial when all the officers testified. By waiting almost two years until December 12, 2000, to file suit, these claims [*sic*] are barred by the one-year statute of limitations." This argument deals with the false report claim only by conflating it with the false testimony claim.[6] More tellingly, it ignores the effect of section 945.3. Plaintiff's claim for false reports may well have *accrued* long *before* the date identified by defendants, perhaps as early as when he first saw the reports. But no matter when the cause of action arose or accrued, section 945.3 tolled the running of the limitations period for any claim based on an "act or omission in . . . reporting the offense . . . ." (§ 945.3.) It therefore squarely applied to the false reports claim, and defeated any limitations defense with respect to that claim.[7]

Because defendants offered no basis for disposing of the false reports claim, their motion failed on its face to state a basis for adjudicating the seventh cause of action. Given defendants' failure to effectively move for a narrower ruling, the court did not err in denying their motion, no matter what the merits may have been of the limitations argument with respect to other claims. The dissent's concentration on that ruling is therefore misplaced.

### 3. *Analytical Framework*

■ The soundness of a statute of limitations defense depends on four variables: (1) What is the governing limitations period? (2) On what date did the cause of action accrue, such that the limitations period began to run? (3) How much time elapsed between accrual and the filing of the complaint? (4) For what period(s) of time, if any, was the running of the statute

---

[6] Commendably, defendants opened the relevant section of their reply memorandum by cautioning the trial court that the timeliness of plaintiff's claims was "an exceptionally complex question which requires careful differentiation among the elements of his federal claims." They then proceeded to disregard this admonition as it affected their own entitlement, or lack of same, to summary adjudication.

[7] It was theoretically open to defendants to show that some or all of the alleged false reports were sufficiently unrelated to the charges remaining after the criminal trial that the verdict in that trial ended the tolling period as to those claims. It suffices here to observe that defendants never attempted such a showing.

suspended (tolled)? If the elapsed time from accrual to filing, less any period of tolling, exceeds the limitations period, then the statute ran before the complaint was filed and the action is barred.

■ The first variable here is not in dispute; the governing limitations period is one year. A cause of action under 42 United States Code section 1983 (section 1983), is subject to the forum state's "residual or general personal injury statute of limitations." (*Owens v. Okure* (1989) 488 U.S. 235, 236 [102 L.Ed.2d 594, 109 S.Ct. 573]; see *Wallace v. Kato* (2007) 549 U.S. 384 [166 L.Ed.2d 973, 127 S.Ct. 1091, 1094, 1098] (*Wallace*).) In 1997, when the events underlying this suit occurred, the limitations period for personal injury actions was one year. (Code Civ. Proc., former § 340, subd. (3); see *Silva v. Crain* (9th Cir. 1999) 169 F.3d 608, 610.) The period was later extended to two years (Code Civ. Proc., § 335.1; Stats. 2002, ch. 448, §§ 2, 3), but plaintiff does not contend that the extended period applies to him.

Nor do the parties dispute that the complaint was filed on December 12, 2000, some 1,354 days after the events giving rise to the cause of action, and 989 days beyond the one-year anniversary of those events.[8] The parties' dispute centers around the questions of when plaintiff's excessive force claim *accrued*, and the extent to which the statute was *tolled*. The first question is one of federal law. (*Wallace, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1095]; *Cabrera v. City of Huntington Park* (9th Cir. 1998) 159 F.3d 374, 379 (*Cabrera*).) The second is one of state law. (*Wallace, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1098].)

In our initial analysis of this matter, we concluded—as the trial court apparently did—that federal law delayed the accrual of plaintiff's cause of action from the time of his arrest until the final disposition of the charges against him. That conclusion rested on *Cabrera, supra*, 159 F.3d 374, which interpreted *Heck v. Humphrey* (1994) 512 U.S. 477, 486–487 [129 L.Ed.2d 383, 114 S.Ct. 2364] (*Heck*) to mean that whenever a section 1983 claim rests on allegations proof of which would invalidate a conviction on related criminal charges, the claim does not accrue until final disposition of the charges. Since the officers' use of excessive force would furnish a defense to several of the charges against plaintiff (see Judicial Council of Cal. Crim. Jury Instns. (2007–2008) CALCRIM No. 2652 ["A peace officer is not lawfully performing his or her duties if he or she is . . . using unreasonable or excessive force in his or her duties"]; *People v. Curtis* (1969) 70 Cal.2d 347, 354 [74 Cal.Rptr. 713, 450 P.2d 33], abrogated on another point in *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1222 [275 Cal.Rptr. 729, 800 P.2d 1159]);

---

[8] These numbers are potentially misleading because the period under scrutiny includes a leap day, February 29, 2000. This factor must always be accounted for when calculating relevant periods by number of days, since most limitation periods are defined in terms of years.

we agreed that plaintiff's cause of action for excessive force did not accrue under *Cabrera* until those charges were dismissed. However, *Cabrera's* reading of *Heck* was repudiated in *Wallace*, where the court held in essence that *Heck's* only effect is to bar the filing of a section 1983 claim in the face of *an existing conviction*, the validity of which is incompatible with the allegations on which the section 1983 claim rests. (*Wallace, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 1098].) Thus, until a conviction is entered, the cause of action accrues normally. Under *Wallace*, therefore, plaintiff's cause of action accrued at the time of the use of excessive force, and the rule of *Heck* never came into play, since plaintiff was never convicted of any offense to which the officers' use of excessive force would constitute a defense.

Since the parties had focused largely on the *Heck-Cabrera* rule, which is now abrogated, we asked them to submit supplemental briefs on the issue, also raised below but less fully briefed on appeal, whether plaintiff's claims were *tolled* under section 945.3. That statute prohibits the filing of claims such as plaintiff's, and tolls the statute of limitations, so long as related criminal charges are "pending before a . . . court."[9] (§ 945.3.) It is undisputed that charges were pending before a court for these purposes from April 18, 1997, when a criminal complaint was filed, to December 13, 1999, when the prosecutor dismissed the remaining charges. This accounted for 969 days, leaving some 20 days in dispute. In essence, the question is whether the statute was running during the 20 days between the use of excessive force and the filing of the criminal complaint. If it was running for any substantial part of this time, plaintiff's claim is barred by the one-year statute of limitations.

---

[9] As in effect when the underlying events occurred, former section 945.3 provided, "No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, while the charges against the accused are pending before a justice, municipal, or superior court.

"Any applicable statute of limitations for filing and prosecuting these actions shall be tolled during the period that the charges are pending before a justice, municipal, or superior court.

"For the purposes of this section, charges pending before a justice, municipal, or superior court do not include appeals or criminal proceedings diverted pursuant to Chapter 2.5 (commencing with Section 1000), Chapter 2.6 (commencing with Section 1000.6), Chapter 2.7 (commencing with Section 1001), Chapter 2.8 (commencing with Section 1001.20), or Chapter 2.9 (commencing with Section 1001.50) of Title 6 of Part 2 of the Penal Code.

"Nothing in this section shall prohibit the filing of a claim with the board of a public entity, and this section shall not extend the time within which a claim is required to be presented pursuant to Section 911.2." (Former § 945.3; Stats. 1983, ch. 272, § 1, pp. 821–822.)

The statute was subsequently amended to reflect the elimination of justice and municipal courts. (Stats. 2002, ch. 784, § 121; Stats. 1998, ch. 931, § 175.)

As pertinent here, application of section 945.3 presents two questions: (1) For purposes of the statute, at what point is a person "charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense"? and (2) when are "the charges against the accused" properly said to be "pending before a . . . court"? Plaintiff contends that a notice to appear, which inferentially was served on him shortly after his arrest, was an "accusatory pleading charging a criminal offense," which commenced the period during which charges were "pending" before the municipal court. Defendants contend that the notice to appear was not an "accusatory pleading" and that in any event no charges were "pending before a court" until the district attorney filed a criminal complaint.

■ The application of the statute thus turns on the meaning of the phrases "accusatory pleading charging a criminal offense" and "charges . . . pending before a . . . court." In answering such a question, we must ascertain the intent of the lawmakers so as to effectuate the purpose of the law. (*In re Harris* (1993) 5 Cal.4th 813, 844 [21 Cal.Rptr.2d 373, 855 P.2d 391].) To determine the Legislature's intent, we first examine the words of the statute in context, giving them if possible their plain, everyday, commonsense meaning. If we find no ambiguity or uncertainty, we presume that the Legislature meant what it said, rendering further inquiry into legislative intent unnecessary. (See *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) If, on the other hand, the statutory language is unclear or ambiguous, i.e., it permits more than one reasonable interpretation, we may consider various extrinsic aids to help us ascertain the Legislature's intent, including legislative history, public policy, settled rules of statutory construction, and an examination of the evils to be remedied and the legislative scheme encompassing the statute in question. (*Ibid.*; *People v. Garrett* (2001) 92 Cal.App.4th 1417, 1422 [112 Cal.Rptr.2d 643].) In such circumstances, we select the interpretation that comports most closely with the apparent intent of the Legislature, with a view toward promoting, rather than defeating, the general purpose of the statute and avoiding an interpretation that would lead to absurd consequences. (*People v. Walker* (2002) 29 Cal.4th 577, 581 [128 Cal.Rptr.2d 75, 59 P.3d 150].) We also attempt to give effect to every word in a statute and avoid constructions that render statutory terms superfluous or meaningless. (*People v. Craft* (1986) 41 Cal.3d 554, 560 [224 Cal.Rptr. 626, 715 P.2d 585].)

### 4. *"Accusatory Pleading"*

■ We must first consider whether a notice to appear constitutes an "accusatory pleading charging a criminal offense" for our purposes. Ordinarily, a person arrested for a misdemeanor, as plaintiff was, is released upon being served with a "written notice to appear in court . . . ." (Pen. Code,

§ 853.6 (section 853.6), subd. (a).) Such a notice, also known as a citation (e.g., *Gates v. Municipal Court* (1992) 9 Cal.App.4th 45, 49, fn. 1 [11 Cal.Rptr.2d 439]; *People v. Domagalski* (1989) 214 Cal.App.3d 1380, 1383 [263 Cal.Rptr. 249]), must set forth "the name and address of the person [charged], the offense [with which he is] charged, and the time when, and place where, [he] shall appear in court." (§ 853.6, subd. (a).) Such an instrument is undoubtedly an "accusatory pleading" as that phrase is generally understood. (See Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2007) Arraignment, § 6.5, p. 142 ["California courts employ four kinds of accusatory pleadings: citation, complaint, information, and indictment."].) Moreover it must be accepted as such for purposes of section 945.3, because otherwise the statutory reference to a "person charged by indictment, information, complaint, or *other accusatory pleading charging a criminal offense*" would be superfluous. Apart from the pleadings specifically mentioned in the statute, a notice to appear (citation) appears to be the only other "accusatory pleading charging a criminal offense" known to our law. (See Cal. Criminal Law: Procedure and Practice, *supra*, Arraignment, § 6.5, p. 142.) Thus if the phrase "other accusatory pleading" does not refer to a notice to appear, it refers to nothing, and the Legislature acted idly in using it. As noted above, the law enjoins us not to impute useless acts to the Legislature when a reasonable alternative appears.

The dissent alludes to Penal Code section 691, subdivision (c) (section 691(c)), which defines " 'accusatory pleading' " to "include an indictment, an information, an accusation, and a complaint." This list echoes section 945.3 except that the latter contains no reference to an "accusation." Could this be the "other accusatory pleading" to which it alludes? We think not. For one thing, had that been what the Legislature intended, it would have saved ink by merely copying the definition from section 691(c), or better yet, cross-referencing it. Moreover, as used in section 691(c), "accusation" refers to the instrument issued by a grand jury in a proceeding under Government Code section 3060 to *remove a public officer* for wilful or corrupt misconduct. (See Pen. Code, § 949.) Although an action under that statute is considered a " '[c]riminal proceeding' " for purposes of evidentiary privileges (Evid. Code, § 903), and is sometimes characterized as a "criminal proceeding" for other purposes (e.g., *People v. Hale* (1965) 232 Cal.App.2d 112, 117 [42 Cal.Rptr. 533] [assigning criminal case number on appeal]), it is *not* viewed as a criminal prosecution in substance. (*Bradley v. Lacy* (1997) 53 Cal.App.4th 883, 890 [61 Cal.Rptr.2d 919] ["[P]rosecution of an accusation under section 3060 et seq. is not a criminal proceeding. [Citations.] . . . [Citation.] [It] is more closely analogous to civil abatement of a nuisance [citation], than to a criminal prosecution"].) Moreover, section 945.3 is not triggered in all "criminal proceedings" but only by an "accusatory pleading charging a *criminal offense* . . . ." Penal Code section 15 describes removal from office

as a "punishment[]" which will support characterization of the predicate conduct as a "crime or public offense," but to constitute such an offense, the conduct must occur "in violation of *a law forbidding or commanding* it . . . ." (Italics added.)

A statute authorizing removal from office for "willful or corrupt misconduct in office" (Gov. Code, § 3060) cannot itself be understood to forbid or command any act. Nor can misconduct justifying such removal otherwise be viewed as a "criminal offense," unless of course it independently offends a penal statute. (See *People v. Superior Court (Hanson)* (1980) 110 Cal.App.3d 396, 400–401 [168 Cal.Rptr. 21] [official subjected to removal proceeding not situated similarly to felony defendant so as to claim equal protection entitlement to preliminary hearing]; *People v. Hale, supra,* 232 Cal.App.2d at p. 119 [statute is "not designed to convict an office-holder of crime, but merely to remove him from his office"; removal may be warranted by "conduct . . . below the standard of decency rightfully expected of a public official"]; *People v. Tice* (1956) 144 Cal.App.2d 750, 754 [301 P.2d 588] [marshal charged with repeatedly overdrawing public bank account; "the phrase 'misconduct in office' is broad enough to include any wilful malfeasance, misfeasance or nonfeasance in office"]; *Coffey v. Superior Court* (1905) 147 Cal. 525, 529 [82 P. 75] [same]; *People v. Harby* (1942) 51 Cal.App.2d 759, 767 [125 P.2d 874] ["It is not required that the misconduct charged against an official should necessarily constitute a crime."]; *In the Matter of Burleigh* (1904) 145 Cal. 35, 37 [78 P. 242] ["the misconduct charged need not necessarily include an act which would itself constitute a crime, and if it does include such crime the judgment on the accusation would not be a bar to a subsequent prosecution for such crime"]; but see *Coffey v. Superior Court, supra,* 147 Cal. at p. 533 ["The charge . . . constitutes both at common law and under the provisions of the Penal Code a public offense,—a misdemeanor in office,—and the proceedings . . . are of a criminal nature."]; *In re Curtis* (1895) 108 Cal. 661, 662 [41 P. 793] [misconduct in office "is . . . a public offense," and action "is a criminal proceeding in the nature of an impeachment"].) Given this context we doubt that the Legislature had such proceedings in mind when it formulated a tolling rule for lawsuits "based upon conduct of [a] peace officer relating to the offense for which the accused is charged . . . ." (§ 945.3.)

Furthermore, the Penal Code expressly makes a notice to appear, in many if not most misdemeanor cases, the equivalent of a complaint, which is unquestionably an accusatory pleading. (See Pen. Code, § 691, subd. (c).) The code provides that once the arresting officer has prepared such a notice, he must file it "as soon as practicable." (§ 853.6, subd. (e).) If the prosecuting attorney has so directed, the officer must file the notice with the magistrate. (§ 853.6, subd. (e)(2).) Otherwise he must file it, along with relevant police reports, with the prosecutor. (*Id.,* subd. (e)(3).) In that case the statute gives

the prosecutor 25 days from the date of arrest to file *the notice to appear or a formal complaint* with the court. (§ 853.6, subd. (e).) If he elects not to proceed, he is required to send the arrestee notice to that effect. (*Ibid.*) However he can also simply let the citation lapse, in which case "any further prosecution shall be preceded by a new and separate citation or an arrest warrant." (*Ibid.*)

Critically, the code declares that the citation (notice to appear), if filed with the magistrate by either the officer or the prosecutor, operates "in lieu of a verified complaint" and "shall *constitute a complaint* to which the defendant may plead 'guilty' or 'nolo contendere.'" (Pen. Code, § 853.9 (section 853.9), subd. (a); see Cal. Criminal Law: Procedure and Practice, *supra*, Arraignment, § 6.6, p. 142 [arraignment on citation].) The prosecutor must file a formal complaint if the defendant fails to appear, fails to post bail, or pleads other than guilty or no contest, but that requirement may be waived in writing (§ 853.9, subd. (a)). Moreover, even in the stated situations, if the notice to appear is prepared on a form approved by the Judicial Council, "when filed with the magistrate [it] shall constitute a complaint to which the defendant may enter a[ny] plea . . . ." (*Id.*, subd. (b).) The defendant then may insist on a formal complaint only if the notice is unverified. (*Ibid.*) The prosecutor has discretion to file a formal complaint in all cases, whether or not required to do so. (See Cal. Criminal Law: Procedure and Practice, *supra*, Arraignment, § 6.7, p. 143; cf. § 853.6, subd. (e).) In many cases, however, he may elect not to do so, and the notice to appear will then be the *only* accusatory pleading ever promulgated.

These provisions make it clear that a notice to appear is an accusatory pleading, though one subject to supersession by a complaint, or defeasance through prosecutorial inaction.[10] The dissent acknowledges this express (though conditional) statutory equation between a notice to appear and a criminal complaint, but characterizes it without explanation as operating only under "limited circumstances." (Dis. opn., *post*, at p. 792.) The dissent also emphasizes the significance of the "complaint" in initiating misdemeanor prosecutions, but of course this misses the point that a notice to appear *is* a "complaint" under the circumstances set forth above, i.e. (1) if it is filed with

---

[10] Defendants' argument to the contrary relies on *Cabrera*, *supra*, 159 F.3d at page 379, which they cite for the proposition that "[a] [n]otice to [a]ppear does not constitute an accusatory pleading under section 945.3." This is a curious reading of that decision, where the court acknowledged without disapproval its earlier statement that "a notice to appear *did* constitute an 'accusatory pleading' under section 945.3." (*Id.* at p. 379, fn. 5, citing *Torres v. City of Santa Ana* (9th Cir. 1997) 108 F.3d 224, 226–227 (*Torres*), italics added.) In both cases the outcome hinged on the question not of what constitutes an "accusatory pleading," but of when criminal charges are "pending before a . . . court." (§ 945.3.) On the question whether a notice to appear is an accusatory pleading for purposes of section 945.3, our conclusion appears to be in complete harmony with them.

the magistrate and the defendant pleads to it (§ 853.9, subd. (a)), or (2) if it is filed on an approved form and verified, or if unverified, the defendant does not insist on a formal complaint (§ 853.9, subd. (b)).

We are satisfied that a notice to appear is an "accusatory pleading" as that term is used in section 945.3.

### 5. Charges "Pending Before a Court"

The more difficult question is at what point, or for what period, charges embodied in a notice to appear are "pending before a . . . court" for purposes of section 945.3.[11] We must first consider whether that phrase has a plain, unambiguous, usual and ordinary meaning as applied in such a context. Plainly it does not. We have elsewhere had occasion to consider what steps in the criminal procedure of this state constitute the initiation of criminal proceedings for purposes of attachment of the Sixth Amendment right to counsel. (*People v. Viray* (2005) 134 Cal.App.4th 1186 [36 Cal.Rptr.3d 693].) We there recognized that such questions may produce markedly varying answers depending on the context in which they arise. (See *id.* at p. 1199.) They are not only context driven but inherently abstract and esoteric. All of these qualities contribute to an inescapable, and obvious, ambiguity. To adopt one specific meaning for such terms on the premise that it is "plain" would be to decide the case by arbitrary proclamation, rather than reasoned adjudication.

The Supreme Court acknowledged a similar point in discussing the "difficulty" experienced by the Legislature in "drafting a workable definition" of the date on which the statutory right to a speedy trial attaches in misdemeanor cases. (*In re Smiley* (1967) 66 Cal.2d 606, 628 [58 Cal.Rptr. 579, 427 P.2d 179].) One early version of the statute had started the clock running when " 'the defendant is arrested and *brought within the jurisdiction of the court.*' " (*Ibid.*, quoting Pen. Code, former § 1382, subd. (3), italics added.) "That formulation," wrote the court, "proved unsatisfactory *because of its vagueness*, giving rise to a variety of appellate interpretations of its meaning." (*In re Smiley, supra,* 66 Cal.2d at p. 628, italics added.) The court cited an example in which the majority concluded that where a defendant was arrested and then a complaint filed, the right attached upon filing of the complaint. (*Ibid.,* citing *Brewer v. Municipal Court* (1961) 193 Cal.App.2d

---

[11] The dissent accuses us of "read[ing]" this language "out" of the statute, and on that basis disregards the following discussion altogether. (Dis. opn., *post,* at p. 793.) We obviously take issue with this characterization. We believe we are reading the language *into* the statute by giving it effect as something more than a trap for the unwary victim of police misconduct. We have started from the presumption that the Legislature had a legitimate objective in mind when it adopted section 945.3, and we have undertaken to effectuate that objective.

510, 514 [14 Cal.Rptr. 391].) A concurring justice opined that the period commenced when the defendant underwent arrest and posted bail. (See *Brewer, supra,* at p. 517 (conc. opn. of Vallee, Acting P. J.).)

If the phrase "within the jurisdiction of the court" is vague, the phrase "pending before a court" is no less so. Defendants insist otherwise, asserting that the phrase is "plain and unambiguous" because "pending means begun but not yet completed or awaiting decision," and a charge cannot be pending until it is "filed," because prior to that point "there is nothing to decide and no question to await on that charge." We reject virtually every component premise of this argument. Most obviously, the word "pending" is *not* intrinsically unambiguous, but quite the reverse. It does not necessarily mean *begun but unfinished;* it can also mean *inchoate or imminent,* i.e., *about* to begin or come into being. (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 858 ["1: not yet decided: being in continuance 2: IMMINENT, IMPENDING"]; American Heritage College Dict. (3d ed. 1993) p. 1010 [to same effect].) Indeed the term "pending" is commonly used to describe criminal charges that *may* be filed but have not been formalized by any means, even an arrest.[12]

In our view the key language in the statute is not the word "pending" but the phrase "before a . . . court." To speak of charges as "pending before a court" implies that a process to bring about their adjudication is not only "imminent" or "impending," but underway. The critical question, which defendants neglect entirely to address, is what concrete steps are required to place charges "before [the] court" for purposes of the statute. The quoted phrase is both abstract and figurative; the resulting ambiguity is compounded by the intricacies of California law with respect to the preliminary stages of misdemeanor prosecutions.

As noted above, a notice to appear may be fully sufficient by itself to place charges before the court for adjudication. If the notice is filed with the magistrate, it is in law a complaint, and the charges are, as of that moment, "pending before [the] court" in every sense. (See § 853.9.) Application of the quoted phrase remains uncertain, however, where a citation is served on the accused but filed with the prosecutor, who may elect to file it with the magistrate, file a formal complaint, drop the prosecution, or defer action. Are the charges "pending before a . . . court" while the citation sits on the

---

[12] E.g., *Aruba Murder Charges Pending* (July 1, 2005) <http://www.cbsnews.com /stories/2005/06/30/world/main705394.shtml> (as of Dec. 4, 2007); *Dermatologist's license suspended, criminal charges pending* (June 29, 2007) <http://www.phillyburbs.com/ pb-dyn/news/103-06282007-1370413.html> (as of Dec. 4, 2007); *Charges pending in Route 4 crash that injured six people* (June 17, 2007) <http://www.topix.net/family/teenagers /2007/06/charges-pending-in-route-4-crash-that-injured-six-people> (as of Dec. 4, 2007).

This point, too—that "pending" does not necessarily mean "underway" but may also mean "imminent" or "on the verge of formal realization"—is entirely overlooked in the dissent.

prosecutor's desk? One way of dealing with this uncertainty in the case at hand would be to note the absence of evidence that this occurred here. Indeed, evidence that a citation may have been promptly filed with the magistrate appears from the municipal court docket sheet, of which we have taken judicial notice at plaintiff's request, and over defendants' objection that plaintiff should have offered it earlier. The docket shows that on April 1, 1997, bail was posted by a bonding company in the amount of $3,000. Plaintiff argues that this amount must have been set by a magistrate, since it represents a near trebling of the scheduled bail amount of $1,050 set forth in the booking information sheet and probable cause affidavit. Specified inferior officials are authorized to release a defendant on bail, but only (as relevant here) in the scheduled amount. (See Pen. Code, § 1269b, subds. (a), (b).) In contrast, section 853.6, subdivision (e), empowers the magistrate to fix bail in an amount he deems appropriate "[u]pon the filing of the notice [to appear] with the magistrate by the officer, or the filing of the notice or a formal complaint by the prosecutor . . . ." Because no formal complaint was filed until April 18, we fail to see how the question of bail could have properly come before the magistrate on April 1 (or sooner), unless the officer or prosecutor had filed a notice to appear by then.[13]

[13] The common practice in this district is for bail to be approved, in circumstances such as these, by a "night judge" or "duty judge," who in the course of granting such approval is necessarily apprised by an officer or jail functionary of the charges on which bail is predicated. The purpose of bail, of course, is to permit the defendant's release while securing his appearance *at trial*. (See Note, *Tinkering with the California Bail System* (1968) 56 Cal. L.Rev. 1134, 1135.) Thus even if defendant was released on bail without issuance of a notice to appear—in apparent contravention of the procedure prescribed by statute—the setting of bail itself establishes that the charges had been placed before a magistrate and were therefore pending before a court. Indeed, this inference flows not only from the *setting* of bail but from the fact that, as reflected in the docket, a *bail bondsman posted bond* on April 1. A bondsman would not long be in business if he were willing to post bail on a mere policeman's say-so. He commits himself to the defendant's *appearance in court* to answer particular charges in a particular case. (See *id.* at pp. 1135–1136 ["The bail system operates to insure the defendant's presence at his trial by creating a financial interest in the performance of his obligations in both the bail bondsman, whose bond is at stake, and in the defendant's relatives and friends, who stand to lose the collateral they have pledged to the bondsman" (fn. omitted)].) If you want to know whether charges are pending before a court, ask the bail bondsman.

The dissent asserts that such inferences are barred by the allegation in plaintiff's complaint that after he initially phoned an acquaintance to arrange bail, "jail officials arbitrarily raised his bail so he could not post immediately post [*sic*] the amount necessary." In keeping with the selective procedural rigor to which we have previously alluded, the dissent characterizes this allegation as a set of "fetters" that "bound" plaintiff so as to absolutely preclude his later assertion that bail was set by a magistrate. (Dis. opn., *post*, at p. 791.) The dissent thus appears to find some clear (but unexpressed) meaning in the terms "jail officials" and "raised" that renders the quoted allegation irreconcilable with the inference plaintiff now urges. Yet the complaint does not assert, as the dissent apparently supposes, that police officers fixed bail without judicial authorization. Fairly read, it asserts only that after indicating bail would be a certain amount, "jail officials" caused it to be elevated to a higher amount, thus whimsically interfering with plaintiff's efforts to secure his release. For all the complaint shows, the "jail

■ However, we decline to decide the case on the narrow basis that the record supports an inference that a notice to appear was actually filed with the magistrate in time to save plaintiff's cause of action. We believe that the principles of statutory construction, to which we have adverted, mandate a reading of section 945.3 that is both simpler of application and more respectful of the legislative objective underlying the statute. Under that reading, charges were "pending before a court" when plaintiff was directed to appear before the court on specified charges by *service* upon him of a notice to appear, regardless whether that notice was ever filed with a court.

The first question in any case of statutory construction is whether the language under scrutiny is ambiguous. In view of the procedural complexities and related authorities noted above, we have no doubt that the intended effect of the phrase "charges pending before a . . . court" is uncertain as potentially applicable in situations like the present one. Given that uncertainty we must consult the purpose of the statute.

The avowed legislative objective of section 945.3 is to *prevent the filing of civil suits* in situations where their pendency might give the plaintiff an unfair advantage in defending against criminal charges. The statute originated with the Police Officers Research Association of California (PORAC), which sought to "eliminate the bringing of civil actions by criminal defendants merely to frustrate and harass the plea bargaining process." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 511 (1981–1982 Reg. Sess.) as amended May 14, 1981, p. 2 (Assembly Judiciary Analysis).) PORAC contended that "frivolous civil damage actions against peace officers are filed for use as

officials" included a duty judge or commissioner, or officers who "raised" the bail by inducing a magistrate to fix an amount higher than they had led plaintiff to expect. The dissent implicitly acknowledges the point by falling back on the premise, which we believe has been amply refuted, that the entire issue must be analyzed within the framework of the papers filed in support of, and opposition to, the motion for summary judgment.

We also note that the dissent's reasoning on this point mistakenly treats a *rule of pleading* as one of factual preclusion. The correct rule is that " 'a *pleader* cannot *cure a defect* in a verified complaint by simply, without legal explanation, omitting such allegations from subsequently filed pleadings. In such a case *the original defect infects the subsequent pleading* so as to render it vulnerable to a demurrer . . . .' " (*Gaglione v. Coolidge* (1955) 134 Cal.App.2d 518, 523 [286 P.2d 568], italics added, quoting *Owens v. Traverso* (1954) 125 Cal.App.2d 803, 804 [271 P.2d 164].) This does not mean that every word dropped in a pleading becomes a binding admission by which the pleader is forever bound. Here, moreover, an "explanation" for any divergence is readily apparent: Until this past February, when the Supreme Court decided *Wallace, supra,* 549 U.S. 384 [127 S.Ct. 1091], both parties treated the limitations issue as turning largely on the federal law governing *accrual* of plaintiff's cause of action. Because that law appeared to favor plaintiff, and because the trial court rejected defendant's arguments to the contrary, plaintiff had no incentive to thoroughly litigate *tolling* under section 945.3. Nor did he have any occasion to revisit the long-dormant allegation, now unearthed sua sponte by the dissent, that unspecified "jail officials" had, by unspecified means, improperly impeded his release on bail.

chips in the plea bargaining process." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 511 (1981–1982 Reg. Sess.) as introduced, p. 2.) The stated purpose of the bill was "to attempt to eliminate the use of civil damage complaints as plea bargaining levers." (*Ibid.*) In urging the Governor to sign the bill, the author asserted that civil actions against arresting or investigating officers "[o]ften times . . . are frivolous and are brought with the specific intent to frustrate and harass the plea bargaining process of the criminal charges." (Sen. Ed Davis, letter to Governor Edmund G. Brown, Jr., Aug. 26, 1981, re Sen. Bill No. 511 (1981–1982 Reg. Sess.).)

The Legislature contemplated that, consistent with this objective, the statute would effect a complete bar to civil suits while criminal charges remained unresolved. It was reported that the bill would "prohibit a criminal defendant from bringing a civil action . . . *before final disposition* of the pending criminal charges at the trial level." (Assem. Judiciary Analysis, *supra*, p. 1, italics added; see *id.* at pp. 2–3 [bill "would prohibit a criminal defendant from filing a civil action . . . until the criminal charges have been disposed of at the trial level"]; *id.* at p. 3 ["a civil action for damages based on criminal charges could not be filed . . . until final disposition of the case at the trial level"].)

It has been suggested that the statute had a further purpose, i.e., "prevent[ing] use of civil false arrest suits as a device to inquire into prosecutorial materials and investigative information while the criminal charge is pending." (*Mohlmann v. City of Burbank* (1986) 179 Cal.App.3d 1037, 1042 [225 Cal.Rptr. 109]; see *McMartin v. County of Los Angeles* (1988) 202 Cal.App.3d 848, 855 [249 Cal.Rptr. 53]; *Harding v. Galceran* (9th Cir. 1989) 889 F.2d 906, 908–909; *Emmert v. County of Sonoma* (N.D.Cal. 1993) 836 F.Supp. 715, 716.) Although we find no explicit legislative history to this effect, inferential support may be drawn from the 1983 amendments to section 945.3. As relevant here, those amendments declared that the disability arising under the statute did *not* extend to the filing of a pre-suit claim under Government Code section 945.4 with the public entity employing the alleged officer-tortfeasors. The effect of the amendments was to compel civil claimants to file such a claim within 100 days after accrual of the cause of action, whether or not criminal charges were pending. This amendment seems difficult to reconcile with the original avowed concern over the use of civil complaints as "bargaining chips," because a criminal defendant could now seemingly employ his pending claim under Government Code section 945.4, and the eventual civil suit it antici-pated, as a bargaining chip. However it is easily reconciled, and indeed is fully consistent, with an intent to withhold from criminal defendants the discovery devices that would become available with the filing of a civil action.

Both of these objectives—avoiding the use of a civil complaint as a bargaining chip in plea negotiations, and preventing the use of civil discovery tools to probe the prosecution's case in a related criminal matter—would be disserved by reading the statute to permit a suit to be filed between the time of serving a citation and the filing of the citation (or a complaint) with a court. Such a regime would encourage a race to the courthouse between law enforcement authorities and arrestees. The legislative history suggests no intent to permit such a circumvention of statutory purpose. The Legislature's goals, both explicit and inferred, are plainly best served if the disability commences when a misdemeanor defendant is put on notice, by service of a notice to appear, that charges are being pursued in court. By restricting the statute's effect to charges pending *before a court*, the Legislature was evidently seeking not to delay the *starting* point of the disability, but to provide a workable formula for determining its *end* point. Without the adverbial qualifier ("before a . . . court"), it might be supposed that charges not resolved by judgment or dismissal remained "pending" until some other prohibition, such as the criminal statute of limitations, barred further prosecution. Under that regime, mere prosecutorial inaction would place the plaintiff's cause of action in limbo. To avoid such open-ended tolling, the Legislature provided that the arrestee would regain the right to file a civil action—and the limitations period would resume running—when the charges could no longer be pursued without new or additional prosecutorial pleadings.

This reading is largely consistent with *Torres*, *supra*, 108 F.3d 224, which appears to be the only published opinion with a square holding on point. The plaintiff there was arrested on March 3, 1994. (*Id.* at p. 225.) A notice to appear was issued at that time, but no accusatory pleading was submitted to a court until a criminal complaint was filed 75 days later. (*Ibid.*) A judgment of conviction was entered some 76 days after that, on August 1, 1994. (*Id.* at pp. 225–226.) The plaintiff filed suit on June 30, 1995, 119 days beyond the one-year limitation period. (*Id.* at p. 226.) The district court concluded that the claim was barred, because the statute was only tolled for the 77 days from the filing of the criminal complaint to the entry of the criminal judgment. (*Ibid.*) The plaintiff contended that this was error, because the statute was tolled from the service of the notice to appear until entry of judgment, a period of 151 days. (*Ibid.*) The Court of Appeals rejected this contention, but on narrower grounds than have since been attributed to it. After acknowledging that a notice to appear is an "accusatory pleading" for purposes of section 945.3 (*Torres, supra*, 108 F.3d at p. 226), the court concluded that the charges were not "pending before a court" throughout the period claimed by the plaintiff, because the notice to appear lost its efficacy as an accusatory pleading when the prosecutor failed to file it or a complaint within 25 days after the plaintiff's arrest. (*Id.* at p. 227; see § 853.6, subd. (e).) As a result, the plaintiff's prosecution "technically could not have been based upon the

March 3 notice to appear. Strictly speaking, the charges against him were not pending before a court until Officer Conde filed the May 17 complaint." (108 F.3d at p. 227.)

We do not disagree with the result in *Torres*, but we diverge somewhat from its reasoning. As we have said, the statute's ambiguity coupled with its express and inferred objectives require that the disability from filing suit arise, as to a misdemeanor arrestee, upon the issuance of a notice to appear, which at that moment is an accusatory pleading fully effective to commence and consummate a misdemeanor prosecution. The *Torres* court seemed to conceive of a regime in which the efficacy of the notice for purposes of section 945.3 could be made to depend, retroactively as it were, on a later event—the prosecutor's decision whether to file the charges with the magistrate within the time allotted by section 853.6, subdivision (e). We believe this approach is unsound, both because it encourages a race to the courthouse and because it introduces complications and procedural pitfalls for which no rational justification appears.[14] The disability therefore attaches, and the statute of limitations is tolled, until the charges are disposed of or the citation loses its efficacy as an accusatory pleading. The latter occurs if neither the citation nor a criminal complaint is filed within the allotted 25 days. In such a case, the disability lifts, and the statute resumes running, 25 days after the arrest. This analysis would not have saved the claim in *Torres*, because the plaintiff there needed to excuse a total of 119 days, and our reading of the statute, coupled with the tolling period the court there acknowledged, would excuse only 102 days. Apart from this divergence, however, we find that case soundly reasoned and supportive of the result we reach here.

The same cannot be said of *Cabrera, supra,* 159 F.3d 374, 379, where the court ignored the possibility, left open in *Torres*, that tolling could commence with a notice to appear if it or a complaint was filed within the statutory period. Instead the court attributed to *Torres* the holding that "charges are not pending before a court until the charges *are filed* with a court." (*Id.* at p. 379, original italics.) This rule achieves the virtue of simplicity, but at the cost of doing violence to the plain legislative purpose of

---

[14] Indeed, the would-be plaintiff may not know, or readily be able to ascertain, when or whether the notice to appear is filed with the magistrate. As a result, under the regime advocated by defendants, plaintiff is unlikely to know, at any time before arraignment (if then), when and whether he is entitled to file suit. Defendants' approach also introduces the difficulty of determining how to deal with a civil complaint that is filed during this putative window of opportunity if criminal charges *are* subsequently pursued. Section 945.3 makes no provision for abating a civil action that is filed after arrest but before charges are "pending before a court." In the absence of abatement, such an action threatens all the evils sought to be averted by enactment of the statute. Had the Legislature expected the statute to allow such filings, it would presumably have provided for abatement. Its failure to do so militates against a construction that creates such a window, or enlarges it beyond the point of unavoidable necessity.

the statute. Insofar as it treats the statutory language as unambiguously directing such a result, we simply disagree with it. It goes without saying that, other than a decision by the United States Supreme Court on a point of federal law, no federal decision binds us as precedent. (*Elliott v. Albright* (1989) 209 Cal.App.3d 1028, 1034 [257 Cal.Rptr. 762].) Here we decline to follow what we consider a mistaken construction of a California statute by a federal court. In our view, section 945.3's purpose—prohibiting the filing of civil suits for use as bargaining chips and avenues of auxiliary discovery and investigation in defense of criminal charges—is best served by construing the ambiguous phrase "charges pending before a court" to describe any charges embodied in a notice to appear so long as the charges have not ceased to be "pending before a court" by virtue of disposition or, as in *Torres,* by defeasance through prosecutorial inaction.

 Here, as we have noted, plaintiff was inferentially served with a notice to appear on March 29 or 30, 1997. No notice to appear has ever been produced, but plaintiff argues persuasively that promulgation of such a notice must be inferred from the circumstances we have described in light of governing statutory requirements. In general, the cite-and-release procedure set forth in section 853.6 is mandatory; the statute declares that, subject to specified exceptions, misdemeanor arrestees "shall" be released under that procedure. (§ 853.6, subds. (a), (h), (i).) To depart from this procedure, the arresting officer must find that the case falls within one of nine specified exceptions, in which case he must "indicate, on a form to be established by his or her employing law enforcement agency, which of [the exceptions] was a reason for the nonrelease . . . ." (§ 853.6, subd. (i).) Here there is no evidence that such a notation was ever made, or that plaintiff was *not* freed from jail pursuant to the statutory cite-and-release procedure. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].)[15] Indeed defendants do not contest the factual point; they rely entirely on the legal proposition that tolling commenced only with the filing of a criminal complaint.[16]

---

[15] The only statutory alternative to these procedures we can find appears in Penal Code section 849, which provides that a person arrested for a misdemeanor without a warrant, "if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate . . . , and a complaint stating the charge against the arrested person shall be laid before such magistrate." No one suggests that this procedure was followed here. If it had been, that would only confirm the tolling of the statute because it would mean that a complaint was filed ("laid before the magistrate") at or before the time of plaintiff's release on bail.

[16] The municipal court docket sheet also indicates that, apparently as of April 1, 1997, an appearance date of July 1, 1997, was set. Further recitals indicate that bail was forfeited on July 1 and reinstated eight days later. We fail to see, and the dissent does not explain, how plaintiff could be formally apprised of his appearance date, or subject to bail forfeiture for failure to appear on that date, unless by a notice to appear. (See Pen. Code, § 853.7.)

It bears noting that the Legislature pointedly amended section 853.6 in 1984 to make its provisions mandatory in all cases of warrantless misdemeanor arrests. The prior version had stated that a misdemeanor arrestee "may, instead of being taken before a magistrate, be released according to the procedures set forth by this chapter." (Former § 853.6, subd. (a), as amended by Stats. 1982, ch. 1103, § 2, p. 4005.) The 1984 amendments replaced "may" with "shall." (Stats. 1984, ch. 952, § 1 p. 3304.) Similarly, the pre-1984 version stated, "A peace officer *may* use the written notice to appear procedure set forth in this section for any misdemeanor offense in which the officer has arrested a person pursuant to Section 836 or in which he or she has taken custody of a person pursuant to Section 847." (Former § 853.6, subd. (h), as amended by Stats. 1982, ch. 1103, § 2(h), p. 4006, italics added.) The 1984 amendments rewrote this provision to state, "A peace officer *shall* use the written notice to appear procedure set forth in this section for any misdemeanor offense in which the officer has arrested a person *without a warrant* pursuant to Section 836 or in which he or she has taken custody of a person pursuant to Section 847." (Stats. 1984, ch. 952, § 1(h), p. 3306, italics added.)[17] In the one case we have found touching on a similar issue, the court relied heavily on the older, permissive language to conclude that a defendant had *not* been released pursuant to the statutory procedure. (*People v. LaRocca* (1983) 143 Cal.App.3d Supp. 22, 24 [192 Cal.Rptr. 624].) In the face of the current flatly mandatory language, such a conclusion appears untenable.

 The notice to appear inferentially served on defendant at the time of his release commenced tolling under section 945.3. A complaint was filed on April 18, 1997, well within the statutory 25 days. Accordingly, the tolling period continued through the final disposition of the charges on December 13, 1999. Plaintiff's complaint, filed December 12, 2000, was therefore timely.

This conclusion makes it unnecessary to consider the difficult issues of federal law arising in the wake of *Wallace.*

### D. *Sufficiency of Evidence of Battery*

Defendants' final contention is that plaintiff's claims against individual officers for battery were not sustained by substantial evidence. Defendants essentially incorporate by reference their argument concerning the sufficiency of the evidence of excessive force. (See pt. I., *ante.*) We reject the argument for the same reasons we rejected it in that context.

---

[17] Penal Code section 836 specifies the conditions under which an arrest may be made. Except as to felonies and certain domestic violence offenses, it requires the arresting officer to have "probable cause to believe that the person to be arrested has committed a public offense in the officer's presence." (Pen. Code, § 836, subd. (a)(1).) Penal Code section 847 concerns arrests by private persons and, as relevant here, "deliver[y]" of the arrestee to a peace officer.

## II. *Plaintiff's Appeal*

### A. *Dismissal of Defendant Baldwin*

#### 1. *Background*

Turning to plaintiff's appeal, we must first consider whether the court erred in dismissing defendant Officer Baldwin from the case. The ruling challenged by plaintiff occurred in limine on June 11, 2003. At that time counsel for defendants made an oral "motion to dismiss and grant judgment to Sergeant Baldwin" on the ground that "all of the causes of action that involve her have been dismissed in the course of these various rulings," such that "it would be appropriate . . . for her to be dismissed from the proceedings." The court pointed out that she was "not mentioned" in the remaining causes of action, including the one under section 1983, in which she was "not mentioned in the caption of the listing of Defendants at the beginning of that cause of action." Plaintiff's counsel stated that her omission was "an error on my part," but also pointed out that the section 1983 cause of action included a paragraph incorporating preceding allegations, including that defendant Baldwin "falsified the witness statements" of two eyewitnesses to plaintiff's arrest. The court reiterated that she was not named as a target in the section 1983 cause of action. It remarked, "I think it is late to try and bring in an individual Defendant again on a cause of action where that individual was not previously named. And it doesn't greatly affect your claims, anyway, whether she is an individual or whether she is acting as a sergeant on behalf of the Department in terms of the policy of the Department." Accordingly, the court ruled, "In the interest of time, I am going to grant the most recent motion, which is to indicate that Sergeant Baldwin is no longer an individual Defendant in this case" in view of the previous disposition of three causes of action in which she was specifically named. The court also commented that it was "too late to amend to bring her in on one of the other causes of action."

Although neither party mentions it, the court apparently made a second dispositive ruling concerning defendant Baldwin later in the trial. This appears from a recital in the court's judgment on special verdicts, entered September 17, 2003. In addition to decreeing that plaintiff should have judgment on specified claims against defendants Milliken, Martin, and Trujillo, and City of Palo Alto, the judgment recites, "After the taking of evidence for the liability phase, but before the liability issues were submitted to the jury, the Court granted the motion for nonsuit brought by defendant Carole Baldwin." This ruling apparently took place on or around June 30, 2003, which was the day liability issues were submitted to the jury. Aside from the quoted recital, we have found no record of this ruling, which the parties seem to disregard.

## 2. *Discussion*

Plaintiff challenges the June 11, 2003 ruling on the grounds that (1) the ruling was in effect a grant of judgment on the pleadings, which was erroneous because the complaint states a cause of action against Baldwin for "malicious prosecution/false reports"; (2) the court abused its discretion in denying leave to amend to add Baldwin's name to the section 1983 cause of action; and (3) viewed as a grant of judgment on the pleadings, the order was procedurally defective.

■ At the threshold we must confront a difficult issue of appellate jurisdiction, because the record before us appears to contain no appealable judgment (or dispositive order) concerning defendant Baldwin. It goes almost without saying that in the absence of express statutory authority, an appeal cannot be taken from an order preliminary to judgment, even one that sounds the death knell for a lawsuit or severable portion thereof; in such a case the appeal must be from the final judgment. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 113, 118–121, pp. 178–179, 182–186.) The appeal may sometimes be *construed* as taken from a later-filed judgment. Here, however, no judgment disposing of the claims against defendant Baldwin appears.

■ The court's oral ruling of June 11, 2003, was apparently reflected only in the reporter's transcript and the clerk's minutes; so far as this record shows it was never reduced to a judgment. The court's later order granting nonsuit, as recited in the eventual judgment against other defendants, might constitute an appealable order "if it [were] in writing, signed by the court, and filed in the action." (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448, fn. 1 [105 Cal.Rptr.2d 856].) The present record fails to establish that any of these conditions was satisfied. Nor can the judgment against other defendants itself be viewed as conferring jurisdiction over plaintiff's challenge to the court's rulings in favor of defendant Baldwin. In a multidefendant case, the entry of a judgment as to one defendant will not establish appellate jurisdiction over alleged errors in the court's treatment of claims against another defendant. (See *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437 [129 Cal.Rptr.2d 436].)

We are thus unable to detect any basis in this record for appellate jurisdiction over plaintiff's claims against Baldwin. The correct disposition of this portion of the appeal is to dismiss it for want of jurisdiction. We will nonetheless observe that we discern no error in the court's June 11, 2003 ruling. The seventh cause of action, in which plaintiff argues Baldwin was or should have been included, alleges that "Defendants" violated section 1983 when they "unlawfully detained, arrested, and imprisoned plaintiff; used unreasonable and excessive force against him; testified falsely in their police

reports and in court so that he would be charged and convicted of crimes he did not commit." Earlier in the complaint appears the allegation that defendant Baldwin, after interviewing the witnesses Walker and Dhonau, wrote a report in which she attributed various statements to them that they did not make. It is also alleged that she "conspired" with Officer Milliken "to give false testimony, and to make their false testimony consistent with the other's [*sic*] false testimony, about whether Sergeant Baldwin changed Agent Milliken's report, and did so without his knowledge"; that she "gave false testimony in her police report and in court" on specified subjects; that she conspired with other officers to provide false testimony about plaintiff's arrest and specified ancillary matters; that plaintiff and his attorney discovered on a specified date that Baldwin had testified falsely; and that had she testified truthfully at his criminal trial, he "would have been acquitted of all charges." It is also true, as plaintiff asserts, that these allegations were technically reiterated in his seventh cause of action, which recited formulaically that he "reallege[d] and incorporate[d] the preceding paragraphs as if set forth here in full."

However, it is not true that the seventh cause of action can be understood to state a cause of action against Baldwin, because it impliedly disclaims any intent to do so. The heading of the cause of action reads, "Seventh Cause of Action—Deprivation of Rights [¶] 42 U.S.C. § 1983 [¶] (Defendants Milliken, Martin, Trujillo, City of Palo Alto, Palo Alto Police Department)." The manifest and customary purpose of such a roster at the head of a cause of action is to convey that the named defendants, and they alone, are the targets of that cause of action. This is a salutary practice, and should be encouraged, but that does not mean that the effect of such a recital can be swept aside when a plaintiff has second thoughts about omitted defendants. The core purpose of any pleading is to give notice to persons affected by it, and the notice given here was that Baldwin was *not* affected by, and did not need to defend against, the seventh cause of action.

The question then is whether the trial court abused its discretion in finding it "too late to amend to bring [Baldwin] in" on that or another cause of action. At the time of the ruling, plaintiff's counsel did not challenge this determination, and did not formally request leave to amend. This might be excused on grounds of futility, given the court's expressed view, but it still might have behooved counsel to make a case for amendment. In particular he might have addressed the critical point, also absent from his brief on appeal, that it *made a difference to his case* whether Baldwin was a named defendant. Any consideration of leave to amend requires weighing the potential prejudice inflicted on the defendant by the plaintiff's delay, against the prejudice inflicted on the plaintiff by forcing him to proceed on the unamended complaint. To the extent that plaintiff sought to fasten individual liability on Baldwin, on a theory not previously pleaded against her, the potential

prejudice to her from a significant increase in stakes is obvious. To the extent plaintiff did *not* seek that objective, he failed entirely to answer the trial court's observation that he could still present much the same case against the defendant city. Nor has he attempted to show on appeal how his case would have been strengthened by including Baldwin in the section 1983 cause of action.

Insofar as the appeal purports to challenge the order dismissing Baldwin from the action, it is dismissed for lack of appellate jurisdiction.

### B. *Issue Preclusion*

#### 1. *Improper Reconsideration*

Plaintiff contends that the trial court erred in taking from the jury the question whether defendants detained plaintiff without legal cause in violation of his constitutional right to be free of unlawful seizures. The court concluded that the denial of plaintiff's motion to suppress evidence, which he brought in the criminal prosecution against him, precluded relitigation in this case of the question whether officers detained him without sufficient cause. As a result of that ruling, the court barred plaintiff from claiming that his detention was a separate section 1983 violation, and instructed the jury "that there has been a judicial determination that Officer Milliken did lawfully detain plaintiff."

Plaintiff contends that these actions conflicted with the earlier order by another judge denying defendants' motion for summary judgment or summary adjudication. That motion was made on the ground, among others, that the denial of plaintiff's suppression motion in the criminal matter collaterally estopped him from contesting the legality of his detention and arrest. In denying the motion, the trial court rejected the claim of collateral estoppel on the implicit premise that plaintiff had not, in the suppression hearing, litigated the question whether officers' versions of events were fabricated.

According to plaintiff, defendant's motion in limine to treat the suppression ruling as conclusive was "an effort to have the trial judge reverse [the] . . . summary judgment ruling," and as such required compliance with Code of Civil Procedure section 1008 (section 1008). That statute limits the right to move for reconsideration (§ 1008, subd. (a)), and to submit repeated applications for "the same order" after it has once been denied (§ 1008, subd. (b)). But an application for a ruling does not seek "the same order" as a previous application merely because it depends on a contention of law that has once been made to another judge, who rejected it. An application at trial to treat a previous adjudication as preclusive of relitigation on a given issue or issues does not seek the same order as a motion for summary judgment or summary adjudication.

Plaintiff's cited authority on this point does not suggest otherwise. In *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485 [23 Cal.Rptr.2d 666], one judge had stayed a lawsuit until a specified condition occurred, but another judge, in defiance of the stay, set the matter for trial. The reviewing court held that the second judge had in effect reconsidered and overturned the first order, which he lacked the power to do except in compliance with section 1008. Plaintiff has cited no case, and we know of none, suggesting that section 1008 bars the judge to whom a case is assigned for trial from ruling on an issue of law as to which another judge has previously *denied* summary adjudication.. To read the statute that broadly would be a prescription for calcified and pointless trial proceedings grinding inexorably toward reversal on appeal for errors that could easily have been corrected but for a perceived lack of power to do so.

The summary judgment procedure is designed to remove issues from the case prior to trial where it is plain that one side or the other has no evidentiary support for its position. The procedure may also be used to adjudicate pure issues of law where the facts are not in dispute. In neither case does a *denial* of the motion finally adjudicate anything except that one party has failed to carry the heavy burden of establishing its entitlement to judgment as a matter of law. The summary judgment procedure is hedged about with procedural restrictions and safeguards precisely because it threatens to deprive the opponent of a trial.

It would be both unwarranted and unwise to hold that such a ruling precludes the moving party from reiterating a purely legal contention at trial. By the time the case reaches a trial department there is no call for the procedural fastidiousness accompanying summary judgment. The parties are presumptively as ready as they will ever be to meet the issues, and the judge is fully charged with the power to resolve all issues of law the parties may present—subject of course to rulings that really *are* preclusive, such as *grants* of summary adjudication. (See Code Civ. Proc., § 437c, subd. (n); cf. Code Civ. Proc., § 128, subd. (a)(8) [declaring power of court to "amend and control its .process and orders so as to make them conform to law and justice."].)[18] For these reasons we reject plaintiff's contention that the trial judge could not entertain defendants' argument on collateral estoppel.

[18] The nonpreclusive effect of denial is explicitly recognized in the directive that a grant of summary adjudication as to some issues "shall not operate to bar" relitigation of other issues "as to which summary adjudication was either not sought or denied." (Code Civ. Proc., § 437c, subd. (n)(2).) This provision would be flatly dispositive here had not the summary judgment motion been denied in its entirety. We can conceive of no reason to suppose that a denial of summary judgment in whole has any more tendency to bind the hands of the trial judge than a denial in part.

### 2. *Preclusive Effect of Suppression Ruling*

We turn then to the merits of the question. Did the trial court properly view the denial of plaintiff's motion to suppress in the criminal action as a determination, conclusive for purposes of this lawsuit, that officers had probable cause to detain plaintiff?

■ Both parties cite *McCutchen v. City of Montclair* (1999) 73 Cal.App.4th 1138 [87 Cal.Rptr.2d 95] (*McCutchen*), in support of their positions. The court there identified the five familiar prerequisites for applying the doctrine of collateral estoppel (issue preclusion) to bar relitigation of an issue addressed in an earlier case: " '(1) the issue is identical to that decided in a former proceeding; (2) the issue was actually litigated and (3) necessarily decided; (4) the doctrine is asserted against a party to the former action or one who was in privity with such a party; and (5) the former decision is final and was made on the merits.' " (*Id.* at p. 1144, quoting *Kelly v. Vons Companies, Inc.* (1998) 67 Cal.App.4th 1329, 1339 [79 Cal.Rptr.2d 763].) The court went on to conclude that these factors permitted giving conclusive effect to a magistrate's ruling at a preliminary hearing that there was sufficient cause to hold the defendant for trial. It held that such a finding barred a claim by the defendant, in a civil suit, that officers arrested him without probable cause.

■ We question the soundness of the narrow holding of *McCutchen* because we do not believe a preliminary hearing either raises the issue of, or provides an adequate opportunity to litigate, the legality of an arrest. The court relied on *Haupt v. Dillard* (9th Cir. 1994) 17 F.3d 285, 290 (*Haupt*), for the propositions that (1) the issue of probable cause to arrest is identical to that of sufficient cause to hold for trial "because, absent a showing that new evidence became available to the prosecution after the plaintiff's arrest, the ruling on sufficiency of the evidence to hold the plaintiff over for trial was a de facto ruling on sufficiency of the evidence to arrest the plaintiff," and (2) "the plaintiff had a full and fair opportunity to litigate the issue of probable cause at the preliminary hearing . . . ." (*McCutchen, supra,* 73 Cal.App.4th at p. 1145, citing *Haupt, supra,* 17 F.3d at pp. 289–290.)

We do not share either belief. The issue of "probable cause" to arrest (or sufficient cause to detain) is simply not the same as—let alone identical to—that of sufficient cause to hold the defendant for trial. (See *People v. Williams* (1989) 213 Cal.App.3d 1186, 1197 [262 Cal.Rptr. 303] ["The issues before a magistrate on preliminary hearing are whether a public offense has been committed and whether there is probable cause to believe the defendant is guilty thereof"].) Indeed, the existence of cause to arrest or detain is *irrelevant* to the issues before the magistrate, and the defendant may be

prohibited on that ground from inquiring into it. (*Ibid.* ["Inasmuch as no suppression motion was made at the preliminary hearing, the only issues before the magistrate were whether a burglary had been committed and whether there was sufficient cause to believe respondent committed it; and defense counsel's questions on cross-examination of the officer relating to his state of mind and what information he had received concerning the break-in had no tendency in reason to prove or disprove the issues before the magistrate"].)

Moreover the magistrate presiding over a preliminary hearing is not empowered to resolve questions of credibility or conflicts in the evidence except as they bear on the existence of "sufficient cause to believe that the defendant is guilty . . . ." (Pen. Code, § 872; see *id.*, § 871.) The magistrate does not decide whether the defendant is actually guilty, but only whether the evidence at the hearing establishes "such a state of facts as would lead a man of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609].) His opinion of guilt or innocence "is of no legal significance whatever in view of the limited nature of the proceedings." (*Id.* at p. 667, fn. 3; cf. *People v. Slaughter* (1984) 35 Cal.3d 629, 637 [200 Cal.Rptr. 448, 677 P.2d 854] [stating that magistrate "is not a trier of fact"].)

■ It follows that a magistrate's finding of probable cause to hold a defendant for trial is not a finding of probable cause to arrest (or detain), and that even if it were, the magistrate's limited factfinding powers do not permit the defendant to "actually litigate" the issue so as to give the magistrate's ruling preclusive effect in a later civil suit.

These objections, however, do not extend to an order, such as the one at issue here, denying a motion to suppress evidence on the ground that officers detained the defendant unlawfully. In that situation the ultimate issues are identical, i.e., whether circumstances supplied sufficient cause for the officers' actions. Here, plaintiff's suppression motion was made on the stated ground that "police officers detained Mr. Schmidlin without reasonable suspicion of any improper or illegal activity." This issue is identical to the one plaintiff raised in his civil action by alleging that he was detained "unlawfully," i.e., without legal cause, and that all of the arresting officers' assertions concerning cause to detain (i.e., plaintiff's apparent drunkenness) were false.

As a criminal defendant moving to suppress evidence, plaintiff was entitled to challenge the officers' credibility, both by attacking it directly and by presenting evidence contradicting their account of events. (See *People v. Needham* (2000) 79 Cal.App.4th 260, 265 [93 Cal.Rptr.2d 899] [court hearing

suppression motion " 'sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences' "]; *People v. Holloway* (2004) 33 Cal.4th 96, 122 [14 Cal.Rptr.3d 212, 91 P.3d 164] [after hearing at which three officers and defendant testified, trial court made "detailed findings regarding the credibility of the witnesses" and relevant facts]; Pen. Code, § 1538.5 (section 1538.5), subd. (c)(1) ["Whenever a search or seizure motion is made in the superior court as provided in this section, the judge or magistrate shall receive evidence on any issue of fact necessary to determine the motion"].)

Giving preclusive effect to a ruling on such issues would not suffer from the infirmities we find in the extension of collateral estoppel to a magistrate's holding orders. Indeed, the parties seemed to agree below that the denial of a motion to suppress could have preclusive effect in the defendant's later section 1983 action if the issue of officers' credibility were put in issue and determined adversely to him. The principal reason put forth by plaintiff's counsel for not giving conclusive effect to the order was that in presenting the suppression motion he "did not challenge the credibility of [the officers] on any of the facts going to probable cause." He described the suppression motion as "a tactical decision to get some information on the police officers' version of events." He pointed out that he had "submitted no evidence" in support of the motion. He also asserted that the record of the suppression hearing did not contain "a single question where I am challenging the officers' version." He stated that he had lacked "a motive to fully litigate the motion" because "even if we had put on our witnesses, it would have been nothing more than Milliken's word against Schmidlin, Walker and D'Honau, an issue of fact and credibility. And we are not going to win that on a motion to suppress pretrial . . . . So that was clearly not what I was trying to do." He argued that this sort of tactical limitation on the issues presented in a suppression motion was recognized in *McCutchen, supra*, 73 Cal.App.4th at pages 1145–1147, as a basis for withholding preclusive effect.

At the cited pages in *McCutchen*, the court wrote that in *Haupt, supra*, 17 F.3d at pages 289–290, "the court acknowledged that in some cases the plaintiff may have tactical reasons for not fully litigating the issue of probable cause at the preliminary hearing, and in those situations, collateral estoppel might not apply." (*McCutchen, supra*, 73 Cal.App.4th at p. 1145.) In turn, the court in *Haupt* "assume[d] that for tactical reasons a litigant may well choose not to litigate probable cause fully during a criminal prosecution, and that in such a case estoppel might be inappropriate." (*Haupt, supra*, 17 F.3d at p. 289.) The court declined to apply any such rationale there, however, because "[w]hatever tactical reasons Haupt's attorney might have had for not pursuing the motion to suppress did not have any effect on the evidence presented at the preliminary hearing." (*Id.* at p. 290.) In *McCutchen* the court did not reach the applicability of that rationale, because it rejected the claim

of preclusion on another ground, i.e., it was apparent from the record that the magistrate relied on evidence that was not available to the arresting officer at the time of the arrest. (*McCutchen*, *supra*, 73 Cal.App.4th at pp. 1147–1148.)

We accept the proposition that a criminal defendant may withhold issues from adjudication at a suppression hearing and thereby preserve them for adjudication in a later civil suit. The defendant should be entitled to put the prosecution to its proof, and to test the legal sufficiency of facts asserted in support of a search or seizure, without forfeiting the chance to prove later that the testimony of the officers was false. In other words, the defendant should be able to test the *legal sufficiency of a claimed justification* for a given search or seizure without challenging the *veracity of the prosecution evidence* on which that claim rests. In such a case, where the latter is not actually litigated, a later assertion of falsity or fabrication should not be foreclosed.

Here it is likely that plaintiff's attorney did, as he says, limit his presentation at the suppression hearing for tactical reasons. It does·not appear that he made a serious effort to persuade the trial court that it should disbelieve the testifying officers. Had he viewed the hearing as a full-out trial of the issue—and the only trial he would get—he would undoubtedly have called the two civilian eyewitnesses, whose testimony was presumably credited on other points by the jury in this action, and who would have provided a basis for arguing that the testimony of the officers, and particularly defendant Milliken, who initiated the encounter, was false. In this sense and to this extent, it is doubtless true that the issue of cause to detain plaintiff was not fully litigated at the suppression hearing.

However, we are troubled, as was the court below, by counsel's frank concession that he brought the suppression motion only for tactical reasons, and that his professed interest in the substantive issues it raised was, in essence, pretextual. Moreover it appears that counsel failed to steer well clear of credibility issues at the suppression hearing. Although he now disclaims any intent to try the issue of officers' credibility, he never conveyed such a limitation to the court presiding over that hearing. On the contrary, he relied on issues of credibility at least twice to justify lines of questioning to which objection was made. Thus he sought to cross-examine Officer Milliken about whether he would ordinarily stop his patrol car 20 feet from another car, as he testified he had done, on this occasion. A relevance objection was sustained, whereupon counsel urged that the question "goes to the credibility. It's odd to leave twenty feet between the cars." Later counsel sought to ask the officer about his decision not to entrust plaintiff to his two companions, asking whether he would "normally be interested in finding out" whether they could take plaintiff with them. Again an objection was lodged on grounds of

relevance, and in the ensuing colloquy counsel answered "Yes" to the court's question, "Is this to impeach his testimony on the facts surrounding the detention and arrest?"

Even more telling was counsel's reliance on credibility as a justification for questioning Officer Martin, who was not called by the prosecutor, but who was present in the courtroom as the designated investigating officer. The prosecutor requested an offer of proof, stating that he would object to Martin's testifying "unless counsel has specific knowledge that the officer has any information that will impeach the previous witness. Other than that it's a fishing expedition, and I don't see how it will go to rebut reasonable suspicion and probable cause for the arrest." The court eventually asked defense counsel, "Do you have information that his testimony will in fact impeach the other witness?," to which counsel replied, "Well, there certainly isn't as much in Officer Martin's report that would lead one to believe that Mr. Schmidlin was staggering drunk. [¶] There may be variations in degree, and I think the testimony would be relevant; it might be so significant that it's highly relevant. Also, since I'm moving to suppress evidence, I'd like to get out exactly what all the evidence is that we're going to want to suppress."

The court then permitted counsel to examine Martin, who testified that he came to the scene in response to a radio request by defendant Milliken for a second unit. Counsel asked questions whose only apparent tendency was to cast doubt, or lay the groundwork for casting doubt, on Milliken's claims that plaintiff was visibly drunk and potentially dangerous. Thus counsel explored what Milliken had said about needing assistance, establishing that the request conveyed no urgency. Counsel also explored whether Officer Milliken's stance toward plaintiff bespoke concern for his own safety and whether Martin himself had noted signs of intoxication.

We recognize that a suppression hearing may not provide as "full and fair" an opportunity to test the veracity of witnesses as is afforded by a civil lawsuit under section 1983. We are also less than entirely satisfied with a regime whose practical consequence may be to require victims of police misconduct to choose between attacking the officers' credibility in an attempt to expose an unlawful acquisition of evidence, and suffering preclusion of civil causes of action that may be meritorious. We repeat that criminal defendants can mitigate the preclusive effect of such orders by confining their challenges to the *legal sufficiency* of a claimed justification for officer conduct, without putting in issue the factual veracity of that justification. Here, however, we cannot fault the trial court's ruling that plaintiff was seeking to "have it both ways" when he used the issue of credibility as a pretext for what he now characterizes as a discovery tactic, and then sought to relitigate that issue "a whole lot more" in a later lawsuit.

### 3. *Finality of Suppression Order*

Plaintiff also asserts that the order denying his suppression motion lacked the "finality" required to receive preclusive effect.[19] He quotes *Heath v. Cast* (9th Cir. 1987) 813 F.2d 254, 258 (*Heath*), for its statement that "[m]otions to suppress evidence under California Penal Code section 1538.5 are not considered final judgments under California law for purposes of collateral estoppel." This statement is echoed in *People v. Meredith* (1992) 11 Cal.App.4th 1548, 1556 [15 Cal.Rptr.2d 285] (*Meredith*). Both cases attribute the stated rule to *People v. Gephart* (1979) 93 Cal.App.3d 989, 999–1000 [156 Cal.Rptr. 489] (*Gephart*). All three of these cases were limited to the preclusive effect *on prosecutors* of orders *granting* suppression motions. In *Gephart* a suppression order made in one county was raised as a bar when the prosecutor in another county sought to pursue different charges. In *Meredith* a federal suppression order was held not to preclude an order denying suppression in a state drug prosecution. In *Heath* an order suppressing evidence was held not to bar the defendants in a section 1983 action from contesting the alleged illegality of their actions. These holdings have no necessary application to an order *denying* a suppression motion. Whether they support the result sought by plaintiff depends on how well their *rationale* applies to the *denial* of suppression here at issue.

As noted, both *Heath* and *Meredith* rest on a rule, supposedly adopted in *Gephart*, that suppression orders are not "final" for preclusion purposes under California law. But that decision announces no such rule. It never mentions the finality requirement, and alludes to the concept of finality only in discussing the "technically improper" dismissal of the original prosecution there under Penal Code section 998. (*Gephart, supra,* 93 Cal.App.3d at p. 996, fn. 3.) The court remarked that this did not create a "problem" there "because the People failed to appeal the [dismissal order], and thus the issue became final by failure to appeal." (*Ibid.*) It is evident that the "finality" here discussed is not the "finality" required for collateral estoppel, for if it were, the quoted conclusion would *contradict* the rule attributed to the case in *Meredith* and *Heath*.

The *Gephart* holding rested on the legislative policies underlying section 1538.5, not on a supposed lack of "finality" or any of the other court-made rules governing collateral estoppel. The court noted that the primary purpose of the statute is to avoid adjudicating the legality of a search or seizure at trial, because jeopardy will then have attached, such that an order suppressing evidence, even if erroneous, would free the defendant without possibility of retrial. (*Gephart, supra,* 93 Cal.App.3d at p. 999.) Section 1538.5 was thus intended to provide for the determination of issues bearing on suppression

---

[19] Defendants fail to address this point.

before trial, and to grant the prosecution various rights to pretrial review of an adverse decision. (*Ibid.*) The court concluded that the Legislature did not intend to make such a pretrial ruling conclusive "beyond the proceedings in which the defendant is involved at the time of the determination." (*Ibid.*) The court was concerned not with the order's effect in civil cases but in other criminal cases. It observed that to give the ruling effect beyond the case in which it was made would turn one prosecutor's decision not to challenge a suppression order into a bar to another's decision to prosecute, even though the first decision might rest on "reasons quite independent of the legality of the search and seizure." (*Id.* at p. 1000.)

The rule in *Gephart* thus hinges on an assessment of the purposes underlying the statute, as reflected in its history as well as the specific procedures it prescribes. In effect those purposes *override* the judge-made law of collateral estoppel. The core statutory objective was to prevent the erroneous *grant* of a suppression motion from affording the defendant an absolute shield against further prosecution. That purpose was not served by permitting one prosecutor's lack of success to bind a prosecutor in another county. In contrast, the Supreme Court later held that the statute as then framed *did* permit the application of collateral estoppel where a prosecutor lost a suppression motion, voluntarily dismissed that case, refiled substantially identical charges in the same county, and then sought to relitigate the defendant's right to suppress evidence. (*Schlick v. Superior Court* (1992) 4 Cal.4th 310, 316 [14 Cal.Rptr.2d 406, 841 P.2d 926].) The statute was subsequently amended to grant the prosecution a limited right to such a "refiling and relitigation procedure." (*People v. Gallegos* (1997) 54 Cal.App.4th 252, 258 [62 Cal.Rptr.2d 666].) The Supreme Court's decision, however, remains as evidence that the restrictions on collateral estoppel noted in *Gephart*, *Heath*, and *Meredith* rest not on the common law elements of that rule but on the express or implied intent of the Legislature with respect to motions to suppress.

▮▮▮ Given that fact, none of these cases substantiates plaintiff's contention that an order *denying* a motion to suppress lacks finality for purposes of issue preclusion. Nor does the statute support such a conclusion. In felony cases, a defendant has a limited right to relitigate issues of fact bearing on a suppression motion where the motion was first made at his preliminary hearing, i.e., he may "renew" the motion at a special hearing prior to trial. (§ 1538.5, subd. (i).) At the renewed hearing, however, the evidence is limited to "the transcript of the preliminary hearing and to evidence that could not reasonably have been presented at the preliminary hearing, except that the people may recall witnesses who testified at the preliminary hearing." (*Ibid.*) Misdemeanor defendants are not even afforded this limited opportunity to revisit the issues bearing on suppression. As to them, the statute contemplates

that those issues will be litigated once, prior to trial, and not revisited.[20] The resulting order is immediately and separately appealable (§ 1538.5, subd. (j)), in contrast to a denial in a felony case, pretrial review of which can only be obtained by extraordinary writ (§ 1538.5, subd. (i)). The discretionary character of the latter remedy may weigh against a finding of finality for preclusion purposes, but the procedure for misdemeanors appears designed to encourage, if not require, a single full and fair hearing of the matter followed by immediate appellate review.[21]

■ These provisions in no way militate against application here of the common law principles governing issue preclusion, under which a prior adjudication may be sufficiently final to support preclusion if it "is determined to be sufficiently firm to be accorded conclusive effect." (Rest.2d Judgments, § 13; see *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1564 [49 Cal.Rptr.3d 259] (*Border Business Park*); *Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932, 936 [190 Cal.Rptr. 29]; *Sabek, Inc. v. Engelhard Corp.* (1998) 65 Cal.App.4th 992, 998 [76 Cal.Rptr.2d 882].) In determining whether a judgment or order satisfies this test, courts look to factors including "(1) whether the decision was not avowedly tentative; (2) whether the parties were fully heard; (3) whether the court supported its decision with a reasoned opinion; and (4) whether the decision was subject to an appeal." (*Border Business Park, supra*, 140 Cal.App.3d at p. 1565.) Here the first, third, and fourth factors unequivocally favor finality: The decision was not tentative, avowedly or otherwise. The court cogently expressed the reasons for its ruling.[22] Only the second factor is debatable, and that only because plaintiff elected not to mount a full-fledged

---

[20] Subdivision (g) of section 1538.5 provides that in misdemeanor cases, "the motion shall be made before trial and heard prior to trial at a special hearing relating to the validity of the search or seizure." (But see § 1538.5, subd. (h) [permitting motion at trial if, prior to trial, "opportunity for this motion did not exist or the defendant was not aware of the grounds for the motion"].) Subdivision (*l*) of section 1538.5 entitles the defendant to a continuance of up to 30 days if he intends to file such a motion "and needs this time to prepare for the special hearing on the motion." That subdivision also entitles him to release on bail or his own recognizance, and authorizes a stay of proceedings, while he prosecutes an appeal from an order denying suppression.

[21] Felony and misdemeanor defendants alike are entitled to challenge an order of denial on appeal from a judgment of conviction. (§ 1538.5, subd. (m).) This does not detract from the evident legislative intent to permit the defendant to litigate the issue only once in the trial court.

[22] The court said, "Based upon the evidence presented before me the court is satisfied that the officer at the time did have sufficient factual foundation to form an opinion the defendant was intoxicated to a level that he was unable to take care of himself and may pose a danger to himself or the public. [¶] This is obviously not the strongest factual case for that conclusion in that he wasn't lying in a pool of his own vomit in the gutter . . . . [¶] On the other hand, the court finds the witness's [*sic*] evidence credible on the issue and believes the officer sincerely subjectively believed what he said and there was sufficient objective factual basis for that opinion."

attack on the officers' testimony. There is no suggestion that the court would have prevented him from being "fully heard" on the issue of their credibility or the verisimilitude of their account. If he was not "fully heard" it was because he so elected. At the same time, as we have previously concluded, he did not clearly withhold the issue of credibility from adjudication. Under these circumstances we conclude that the order was sufficiently firm to be deemed final.

 Plaintiff also alludes to the statement in *Meredith, supra,* 11 Cal.App.4th at page 1556, that "collateral estoppel effect is ordinarily accorded only to determinations reached in proceedings in which jeopardy [has] attached." In the preceding paragraph, however, the court stated that "[c]ollateral estoppel applies in criminal proceedings independent of double jeopardy principles." (*Id.* at p. 1555.) All of the cases we have discussed here recognize that issue preclusion may indeed arise from pretrial rulings in criminal cases. The quoted statement furnishes no basis to suppose that it did not arise here.

Plaintiff has failed to convince us that the trial court erred in applying issue preclusion to withhold the question of illegal detention from the jury.

### C. *Jury Instructions on False Arrest and False Reports*

#### 1. *Undue Emphasis*

The jury found against plaintiff on his claims that officers arrested him without probable cause and falsified police reports in order to subject him to prosecution. Plaintiff contends that these findings were the product of several erroneous instructions. First he complains that the court rejected the pattern instruction on probable cause (BAJI No. 7.66) in favor of instructions crafted by defendants, which he characterizes as a "long discussion repeatedly slanted toward the police officers." He identifies eight statements that, he says, "discuss probable cause concepts from a police officer's perspective and . . . are not balanced with any statements from an arrestee's perspective . . . ." He does not appear to contend that any of these statements mischaracterize the applicable law, or that any germane principle of law was omitted. Rather he cites *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64], where the court wrote that "it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a [correct] legal proposition."

We are not convinced that the challenged instruction unduly emphasizes issues or theories favorable to the defense. Insofar as plaintiff's complaint

targets statements that track a defense contention without an immediate countervailing statement of plaintiff's position, we are not directed to any point in the record where these exact objections were lodged or appropriate amendments proposed. Nor can we say that these errors of emphasis, if any, are likely to have affected the verdict. (See *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 655–656 [11 Cal.Rptr.3d 807]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573–580 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203].)

### 2. *Probable Cause to Arrest*

Plaintiff next contends that the instruction proffered by defendants and given by the court erroneously called upon the jury to decide not only the facts surrounding plaintiff's arrest but also the legal question of probable cause to arrest. The court's instructions did diverge from the approved pattern instructions on this subject. BAJI No. 7.66 contemplates that the court will specify for the jury the facts which, if found, would furnish probable cause to arrest, telling the jury that if it finds those facts, it "must find that there was reasonable cause to [arrest] [detain] the plaintiff." Judicial Council of California Civil Jury Instruction (2007) CACI No. 1402, which instructs on probable cause as an affirmative defense to a false arrest claim under state law, likewise requires the court to specify "facts that, if proved, would constitute reasonable cause to believe that plaintiff had committed a crime in defendant's presence," and states that if the defendant proves those facts, he "had the authority to arrest [the plaintiff] without a warrant." (Italics and boldface omitted.)

Here the court gave instructions, set forth in full in the margin,[23] that may be paraphrased as follows: A person may not be arrested without probable cause. Probable cause exists where facts known to the officer at the time of arrest were "sufficient to lead a reasonably prudent police officer to believe

---

[23] As transcribed by the reporter, the pertinent instructions stated as follows:

"Under the United States Constitution, a person may not be arrested without probable cause for the arrest. Probable cause exists where the facts and circumstances known to a law enforcement officer at the time of the arrest, or the information supplied to the officer before making the arrest, were sufficient to lead a reasonably prudent police officer to believe that the crimes the plaintiff was arrested for had been committed, and that the plaintiff was the person who committed at least one of them, one of the offenses. An arrest made with probable cause is lawful even if it turns out later that the plaintiff did not commit any of the crimes for which is he was arrested.

"Again, plaintiff bears the burden of proving by a preponderance of the evidence that the arrest was not justified by probable cause.

"Whether it was reasonable for an officer to believe that plaintiff had committed a crime obviously turns on whether the plaintiff's behavior observed by the officers constituted one of the crimes for which plaintiff was arrested. You should understand, a person's refusal to

that the crimes the plaintiff was arrested for had been committed, and that the plaintiff was the person who committed at least one of them." Probable cause is not established by refusal to answer questions or identify oneself, or by "verbal opposition, criticism, or challenge" to the officer's conduct. Plaintiff was arrested for public intoxication and resisting an officer, and was later charged with giving false identification. If Officer Milliken had probable cause to arrest for any of these charges, the arrest was lawful. If he did not, it was unlawful.

■ The vice in these instructions, says plaintiff, is that they required the jury to determine the existence of probable cause, which is a "question of law." (Com. to BAJI No. 7.66.) This contention relies on the vexing and arguably somewhat chimerical distinction between questions of law and questions of fact. It is said that when a claim of false arrest is made, the existence of circumstances offered to justify the arrest is a "question of fact" while the sufficiency of those circumstances to actually justify the arrest is a "question of law." What is meant by this is that if the relevant events and circumstances are controverted, a jury must decide what they were; but that the court must decide whether a given set of circumstances satisfies the legal requirements captured under the rubric of "probable cause." This has led to the judicial pronouncement on which the pattern instructions are based: "When the facts are controverted or the evidence is conflicting, the jury must be instructed as to what facts, if established, constitute reasonable [i.e., probable] cause. Only the question of the existence of such facts should be submitted to the jury. It is error to give the jury a definition of reasonable

---

answer questions or to identify himself does not itself create probable cause to arrest. A person may verbally oppose, criticize or challenge police action. Such verbal opposition, criticism or challenge is not itself grounds to arrest the person.

"Plaintiff was arrested, and was prosecuted by the District Attorney, first, for the crime of public intoxication in violation of California Penal Code section 647(f). That section, 647(f) of the California Penal Code, states that a person found in a public place, willfully under the influence of alcohol or any combination of alcohol and drugs in such a condition that he is unable to exercise care for his own safety or the safety of others, is guilty of disorderly conduct, and it is a misdemeanor.

"Plaintiff was also arrested for, and was prosecuted by the District Attorney, for the crime of resisting, delaying, or obstructing an officer in the discharge of his duties, a violation of California Penal Code Section 148(A). This charge was based upon plaintiff's alleged attempts to leave after he was lawfully detained.

"Finally, plaintiff was arrested and prosecuted by the District Attorney for the crime of giving false identification in violation of California [P]enal Code Section 148.9, which makes it a misdemeanor to provide false information or false identification to a police officer for the purpose of evading proper identification.

"It is not necessary for probable cause to be found for each of the offenses charged. If you find that Officer Milliken had probable cause to arrest the plaintiff for any of the offenses for which he was charged, the arrest was lawful. However, if you find that Officer Milliken did not have probable cause to arrest plaintiff for any of the offenses for which he was charged, the arrest was unlawful."

cause and to instruct them to determine if the facts are within or without that definition. [Citations.]" (Com. to BAJI No. 7.66; see Sources and Authority, foll. CACI No. 1402, p. 755, quoting *Gibson v. J. C. Penney Co., Inc.* (1958) 165 Cal.App.2d 640, 645 [331 P.2d 1057] ["[W]here the evidence is in conflict, ' "it [is] the duty of the court to instruct the jury as to what facts, if established, would constitute probable cause" ' "].)

Reconsideration of this rule may be overdue. The instruction it mandates resembles in form the "formula" instructions that have long been a subject of judicial criticism. (See 7 Witkin, Cal. Procedure, *supra*, Trial, § 324, pp. 367–368.) Nor is it clear that such an instruction is any more necessary (or appropriate) in this setting than in the many others where an element of the plaintiff's case depends on the resolution of factual controversies and the application of rules of law to the resulting findings. The instruction given here did not vest the jury with the power to decide what the law requires to justify an arrest. It told the jury that an arrest required probable cause, that probable cause consisted of a certain state of facts, and that if the jury found those facts, there was probable cause. As affecting the allocation of functions between the judge and the jury, this approach appears indistinguishable in logical substance from that proposed by plaintiff. Given this essential equivalence, it is difficult to see how the instructions could have prejudiced plaintiff even if erroneous in form.

### 3. *Arrest Versus Detention*

Plaintiff contends that the court's instructions "virtually told the jury that [he] had been lawfully arrested." He predicates this argument on the facts that (1) the court discussed arrest and detention together without telling the jury that they were two separate concepts; and (2) the court told the jury that "there ha[d] been a judicial determination that Officer Milliken did lawfully detain plaintiff." Plaintiff says a reasonable juror would equate the two concepts and conclude that the lawfulness of the arrest had already been determined.

This argument refers to the following passage of the instructions: "Plaintiff claims that defendant Milliken arrested him without a warrant without [*sic*] probable cause for the arrest. Plaintiff seeks to recover money damages on this claim against Officer Milliken. Officer Milliken admits that he arrested the plaintiff, but he contends that, under the circumstances involved in this case, the arrest was lawful because he had probable cause to arrest the plaintiff. [¶] Police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that a person is engaged in criminal activity. The officer's articulable facts must amount to more than a hunch. Detention for investigation is

measured by an objective standard as to whether other officers in the same position would have suspected defendant of criminal activity at the time of detention. You are instructed that there has been a judicial determination that Officer Milliken did lawfully detain plaintiff. [¶] Under the laws of the State of California, defendant Milliken, as a police officer, had the right to arrest the plaintiff without a warrant if he had probable cause for believing that plaintiff had committed a crime. . . ."

No doubt this instruction could be improved in several ways, but we fail to see that it posed any significant danger of leading the jury to equate the concept of arrest with that of investigatory detention. It is common knowledge that arrest contemplates taking a person into custody. This common conception cannot readily be confused with the power of an officer to "stop and briefly detain a person for investigative purposes." Nor is it accurate to say, as plaintiff does, that "[t]here was no transition or contrasting language indicating that the jurors were going to hear about a new concept" when the court went from arrest to detention and back to arrest. There may have been no *oral* signal that the subject was shifting, but as indicated above, the three relevant sections were separated by paragraph breaks. The jury was not restricted to hearing the instructions read aloud, but also received them, as the court said, "in written form." It therefore is not the case that, as plaintiff asserts, "[t]he instruction's three sentences about lawful detention were . . . fit seamlessly into instructions on probable cause." The seams might have been made more conspicuous, but they were noticeable, and we are not convinced that a reasonable juror would have failed to discern them.

### 4. *Later-charged Offenses*

Plaintiff contends that the instruction erroneously permitted the jury to find his arrest lawful if probable cause existed to arrest for any of the charges ultimately brought against him. He asserts that an arrest must be justified based on the charges for which he was arrested or for later charges *based on the same conduct*. The instruction was deficient, he contends, for permitting the arrest to be justified by later charged offenses that did not satisfy the italicized condition.

▮ The substantive rule on which this argument depends has been rejected by the United States Supreme Court. In *Devenpeck v. Alford* (2004) 543 U.S. 146, 153 [160 L.Ed.2d 537, 125 S.Ct. 588] (*Devenpeck*), the court held that in a section 1983 action alleging an unlawful arrest, the probable cause inquiry is *not* confined to the charge invoked by the officer at the time of the arrest or to " 'closely related' " charges. The court reaffirmed earlier holdings that the test for probable cause is an objective one: "Those are

lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." (*Id.* at p. 155.)

Plaintiff acknowledges this holding but contends it cannot be applied here because that would constitute retroactive application and "constitutional rules of criminal procedure" are retroactive only as to " 'cases not yet final.' " (Quoting *People v. Reyes* (1998) 19 Cal.4th 743, 755 [80 Cal.Rptr.2d 734, 968 P.2d 445].) But adhering to *Devenpeck* would not present a question of "retroactivity," and as applied in this case would not involve a rule of "criminal procedure."

While the holding in *Devenpeck* may carry over into criminal cases, it arose in the context of, and was only directly concerned with, a question of *tort* law, i.e., whether a section 1983 plaintiff can state and prove a cause of action for wrongful arrest by establishing that an officer lacked probable cause to arrest for the crime announced by him, even though the officer possessed probable cause to arrest for a different offense. In *Harper v. Virginia Dept. of Taxation* (1993) 509 U.S. 86, 95–97 [125 L.Ed.2d 74, 113 S.Ct. 2510], the court repudiated earlier suggestions that decisions announcing new rules of federal law in civil cases may be given limited retroactive effect. It found that a majority of justices had agreed in an earlier decision that "a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." (*Id.* at p. 96, citing *James B. Beam Distilling Co. v. Georgia* (1991) 501 U.S. 529 [115 L.Ed.2d 481, 111 S.Ct. 2439].) Plaintiff offers no rationale for departing from this mandate. Accordingly his challenge to this instruction must fail.

### Disposition

The judgment is affirmed. Plaintiff shall recover his costs on appeal.

McAdams, J., concurred.

**MIHARA, J.,** Dissenting.—The majority opinion misconstrues both the evidence and the law in its analysis of the statute of limitations issue. As a result, the majority opinion erroneously rejects the City of Palo Alto's (City) contention that it was entitled to prevail on its claim that the federal excessive force cause of action was barred by the statute of limitations. A correct analysis requires a conclusion that the City[1] was entitled to

---

[1] There are several individual defendants in addition to the City, but I will usually refer to them collectively as the "City" for ease of reference.

prevail on its summary adjudication motion asserting that the statute of limitations barred Michael Schmidlin's federal excessive force cause of action, which would have precluded Schmidlin from prevailing on that cause of action. Therefore, I must respectfully dissent.

## I. The Statute of Limitations Issue

### A. Preservation of Issue Below

Schmidlin argues that the City failed to preserve the statute of limitations issue for review on appeal because the issue was not raised at the jury trial, although the City raised the issue in its summary adjudication motion and in a motion for judgment notwithstanding the verdict.

### 1. Background

Schmidlin alleged in his complaint that the excessive force occurred on March 29, 1997, at the time of his arrest. He made no allegations regarding when criminal charges were filed. Schmidlin's civil complaint was filed on December 12, 2000. In its answer, the City asserted the affirmative defense of the statute of limitations.

The City filed a motion for summary judgment or summary adjudication in which it argued that Schmidlin's federal excessive force cause of action was barred by the statute of limitations.[2] The City explicitly addressed the

---

[2] The majority opinion insists that the City's notice of motion, motion, and separate statement were inadequate because the City did not adequately identify the "cause of action" that was targeted by its summary adjudication motion.

The "Seventh Cause of Action" in Schmidlin's complaint alleged that the City's police officers violated 42 United States Code section 1983 when they "unlawfully detained, arrested, and imprisoned plaintiff; used unreasonable and excessive force against against [sic] him; testified falsely in their police reports and in court so that he would be charged and convicted of crimes he did not commit." The City's notice of motion sought "summary adjudication" of Schmidlin's "Seventh [and other] . . . Causes of Action . . . ." The City's motion specified that the City sought summary adjudication of Schmidlin's "claim for damages under 42 U.S.C. § 1983 . . . for deprivation of federal civil rights, based upon his arrest, the use of force to arrest him, and alleged false statements in police reports and trial testimony used to prosecute him."

The majority opinion suggests that the City's notice of motion and motion were inadequate to support summary adjudication of the excessive force claim in Schmidlin's Seventh Cause of Action because the City did not adequately specify that it was seeking summary adjudication of *each* of the *separate* causes of action that *Schmidlin* had *combined* in his Seventh Cause of Action.

"A motion for summary adjudication shall be granted only if it *completely disposes of a cause of action*, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1), italics added.) This statutory language has been long been

question of whether the limitations period had been tolled under Government Code section 945.3. It noted that the complaint had not been filed until April 18, 1997, and therefore the tolling period had not begun until that time, which rendered untimely Schmidlin's civil complaint alleging a federal excessive force cause of action. The City's motion did not initially address the federal law accrual issue. The City's separate statement set out as an undisputed fact that the criminal complaint was filed on April 18, 1997.

Schmidlin's opposition to the City's motion asserted that his federal excessive force cause of action was not barred, because accrual was delayed under federal law and a period of time was tolled under state law. He explicitly acknowledged that the tolling period commenced "from the time charges are *filed* . . . ." Schmidlin did not assert that criminal charges were pending before a court at any time prior to the filing of the criminal complaint. In his separate statement, Schmidlin admitted that it was undisputed that the criminal complaint was filed no sooner than April 18, 1997.[3] In a declaration in opposition to the City's motion, Schmidlin's attorney declared that he had "attempted to obtain the police report" "a few weeks after

interpreted to permit summary adjudication of "separate and distinct wrongful acts which are combined in the same cause of action. To rule otherwise would defeat the time and cost saving purposes of [the current version of Code of Civil Procedure section 437c] and allow a cause of action in its entirety to proceed to trial even where, as here, a separate and distinct alleged obligation or claim may be summarily defeated by summary adjudication. . . . [A] party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action." (*Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855 [16 Cal.Rptr.2d 458], fn. omitted; accord, *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688, fn. 11 [60 Cal.Rptr.2d 195].)

The majority opinion relies on *Gonzales v. Superior Court* (1987) 189 Cal.App.3d 1542 [235 Cal.Rptr. 106] (*Gonzales*) to support its contention that the City was required to be more specific in its notice of motion and motion. *Gonzales* is inapt for two reasons. First, the summary *judgment* motion in *Gonzales* made no mention whatsoever of summary adjudication, so it obviously was inadequate to support the summary adjudication of issues that the superior court granted. (*Gonzales*, at p. 1544.) Moreover, at the time of *Gonzales*, California law permitted summary adjudication of *issues*, a procedure which the Legislature disposed of long ago. "[T]here is no longer any reason for a notice of motion to identify specific issues; a listing of the disputed causes of action, as was done here, is sufficient." (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1478 [16 Cal.Rptr.2d 888].) California Rules of Court, rule 3.1350(b), which the majority opinion also cites, does not require the notice of motion or motion to do anything more than specify the cause of action, which the City's motion did.

The City's notice of motion and motion listed the causes of action that were the subjects of the summary adjudication motion, and the motion further identified the federal excessive force claim as a subject of the motion. It follows that the City's notice of motion and motion were not procedurally inadequate to support a summary adjudication of Schmidlin's federal excessive force cause of action, notwithstanding the fact that he had combined this cause of action with others in a single count of his complaint.

[3] A copy of the misdemeanor complaint appears in the record. It bears no file stamp, but it indicates that it was drafted on April 17, 1997.

Mr. Schmidlin was arrested," but was told that he could not obtain it because "no charges had been filed" and it was not clear when or if charges would be filed.

The City's reply to Schmidlin's opposition argued that the federal law accrual rule relied upon by Schmidlin did not apply to the federal excessive force cause of action.

The superior court denied the City's motion for summary adjudication of the federal excessive force cause of action. The superior court did not identify any factual disputes as to this issue.[4] It acknowledged that "tolling" would *not* make the civil complaint timely because the arrest had occurred on March 29, 1997, the criminal complaint charging Schmidlin with criminal offenses was filed on April 18, 1997, the criminal charges were dismissed on December 13, 1999, and the civil complaint was not filed until December 12, 2000. However, the superior court accepted Schmidlin's legal argument that this cause of action did not *accrue under federal law* until the criminal charges were dismissed, because "[t]he time between the arrest and the filing of the criminal complaint is not counted . . ." under the federal law accrual rule.

In its trial brief, the City renewed its claim that the statute of limitations barred the federal excessive force cause of action and suggested that the statute of limitations issue could be tried separately to the court in advance of the jury trial. However, the appellate record does not reflect that the City pursued this issue, and the City did not place the statute of limitations issue before the jury at trial. During in limine motions, Schmidlin's trial counsel stated that the criminal charges had been filed "about a month" after Schmidlin's arrest.

The jury returned a special verdict finding in favor of Schmidlin on the federal excessive force cause of action and the state law battery cause of action. The jury determined that Schmidlin's damages were $24,000. The damage award was not allocated between the two causes of action, but it was allocated between the three officers who were found to have used excessive force and to have committed battery. Officer Trujillo, who was only found liable on the state law battery cause of action (because he had qualified immunity on the federal cause of action), was found liable for $1,500 of the

---

[4] "Upon the denial of a motion for summary judgment, on the ground that there is a triable issue as to one or more material facts, the court shall, by written or oral order, specify one or more material facts raised by the motion as to which the court has determined there exists a triable controversy. This determination shall specifically refer to the evidence proffered in support of and in opposition to the motion which indicates that a triable controversy exists." (Code Civ. Proc., § 437c, subd. (g).)

$24,000 in damages. Schmidlin was awarded attorney's fees against Officers Milliken and Martin (but not Trujillo).

After the jury's verdicts, the City brought a motion for judgment notwithstanding the verdict (JNOV) in which it renewed its contention that the federal excessive force cause of action was barred by the statute of limitations. The City's argument was based on its summary adjudication motion on this issue. In Schmidlin's opposition to the City's JNOV motion, he did not make any assertions about when an accusatory pleading was filed or when the criminal charges became pending before a court.

At the hearing on the JNOV motion, the trial court expressed the (mistaken) belief that the summary adjudication motion had been denied as to the statute of limitations issue "based on the existence of triable issues of fact . . . ." The court asserted that the separate statements had not established "any of the relevant dates other than the date of arrest." The court noted that it was "limited to the trial record," and it asked the City's trial counsel to "cite to me where that evidence appears" that would prove that "the statute of limitations was exceeded here." "[T]here has to be something in the trial record, something that was before the Court and before the jury, that contains those dates. And again, I know the date of arrest was talked about during the trial. I don't recall if the date of filing of the original charges was on the record. I don't know if the date that the civil complaint ultimately was filed is on the record. . . . Because if those dates aren't in the record, then, I have no basis to make a determination, as [the superior court] had no basis to from the separate statement to determine whether the statute had been exceeded or not."

The trial court denied the JNOV motion on the ground that it was an inappropriate motion where the issue had not been placed before the jury at trial.

## 2. Analysis

Schmidlin contends that the City cannot raise the statute of limitations issue on appeal because a challenge to the denial of a summary judgment motion cannot be raised after a trial on the merits. The City adequately preserved the statute of limitations issue for appeal in this case by bringing a summary adjudication motion on the issue.[5]

---

[5] The majority opinion asserts that the City has "explicitly disclaimed" its contention that the superior court erred in denying its summary adjudication motion. (Maj. opn., *ante*, at p. 742.) The majority opinion misconstrues the briefs.

In its opening appellate brief, the City asserted that the superior court's denial of its motion for summary adjudication of the federal excessive force cause of action on statute of

Schmidlin relies on *Waller*, *supra*, 12 Cal.App.4th 830, to support his contention that the City cannot raise the statute of limitations issue on appeal. *Waller* was a judgment roll appeal (there was no reporter's transcript) after a jury verdict in favor of the lessor plaintiffs in an action for unpaid rent due under a lease. (*Waller*, at pp. 831–832.) The lessee defendant's sole contention on appeal was that the superior court had erred in denying its summary judgment motion. (*Waller*, at p. 832.) The defendant had sought summary judgment on the ground that there was no dispute of fact that it was not obligated to pay the allegedly unpaid rent. (*Waller*, at p. 832.) The summary judgment motion was denied on the ground that there was a dispute of fact as to whether the plaintiffs were entitled to the unpaid rent under the lease. (*Waller*, at p. 832.) Because the appeal was on the judgment roll, the judgment was presumed to be correct and to be supported by the evidence. (*Waller*, at p. 832.)

The court concluded that an error in denial of summary judgment could not result in reversal under these circumstances unless the error prejudiced the defendant at trial. (*Waller*, *supra*, 12 Cal.App.4th at p. 833.) "Since we are enjoined to presume that the trial itself was fair and that the verdict in plaintiffs' favor was supported by the evidence, we cannot find that an erroneous pretrial ruling based on declarations and exhibits renders the ultimate result unjust." (*Waller*, at p. 833.) "Our opinion is limited to situations in which a party moves for summary judgment on the ground that there is no triable issue of fact, the motion is denied, and the same questions raised by the motion are then decided adversely to the unsuccessful moving party after a trial on the merits which is itself free from prejudicial error." (*Waller*, at p. 836; accord, *Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 591 [13 Cal.Rptr.3d 370]; *California Housing Finance Agency v. Hanover/California Management & Accounting Center, Inc.* (2007) 148 Cal.App.4th 682, 688 [56 Cal.Rptr.3d 92].)

---

limitations grounds was "error." It also asserted that the trial court had erred in denying its JNOV motion. Schmidlin responded by contending that the superior court's order denying summary adjudication "is not appealable," relying on *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830 [16 Cal.Rptr.2d 38] (*Waller*). As I explain in the text, *Waller* is inapplicable here. The City responded to this argument by claiming that it was not appealing from the denial of the summary adjudication motion but instead challenging the trial court's error in "denying JNOV and in entering judgment . . . ." In its supplemental briefing, the City repeated that it was challenging the court's error in "denying JNOV and in entering judgment . . . ."

It is readily apparent to me that the City has not *abandoned* or *disclaimed* its contention that the denial of its summary adjudication motion was erroneous. The City, perhaps recognizing that it could not directly appeal from the denial of a summary adjudication motion and not wishing to attack *Waller*, chose to rephrase its argument as an assertion that the trial court erred in *entering judgment*, obviously incorporating its argument in the opening brief regarding the nature of the error and implicitly asserting that the entry of judgment was erroneous *because of* the superior court's error in denying the summary adjudication motion.

The limited holding in *Waller* does not apply here because summary adjudication was *not* denied on the ground that there was a triable issue of fact but on legal grounds, and the statute of limitations issue was *not* litigated at trial and was *not* resolved adversely to the City by the trier of fact. Under these circumstances, the denial of a summary judgment motion may constitute prejudicial error and require reversal of the judgment after trial. (*Gackstetter v. Frawley* (2006) 135 Cal.App.4th 1257, 1268–1270, 1279 [38 Cal.Rptr.3d 333].)

In this case, the City was prejudiced by the denial of its summary adjudication motion if that denial was erroneous. The superior court's denial of the summary adjudication motion was not based on *disputed facts* but on the superior court's rejection of the City's *legal position*. The City had nothing to gain by presenting the statute of limitations issue to the jury because this legal ruling completely undermined its position. It would not have been possible for the jury to resolve this issue in the City's favor under the legal ruling that resulted in the denial of the City's summary adjudication motion. On the other hand, if the superior court had granted the summary adjudication motion, the federal excessive force cause of action would have been removed from the jury's consideration.[6] The City is not precluded from mounting an appellate challenge to the superior court's denial of its summary adjudication motion on the statute of limitations issue.

## B. Federal Accrual Issue and Retroactivity

After oral argument in this case, the United States Supreme Court held in *Wallace v. Kato* (2007) 549 U.S. 384 [166 L.Ed.2d 973, 127 S.Ct. 1091] (*Wallace*) that accrual of a cause of action under 42 United States Code section 1983 (in *Wallace* a cause of action for false arrest) is *not* delayed until the conclusion of the criminal proceedings. This court thereafter solicited supplemental briefing on the impact of *Wallace*. In his supplemental briefs, Schmidlin claims that *Wallace* cannot properly be applied to this case. Relying on *Chevron Oil Co. v. Huson* (1971) 404 U.S. 97 [30 L.Ed.2d 296, 92 S.Ct. 349] (*Chevron*), Schmidlin argues that *Wallace* is not retroactive. In a supplemental brief, Schmidlin admits that *Chevron* has been overruled and argues that the 1993 case overruling *Chevron* is somehow inapplicable here. He is incorrect.

---

[6] "If a motion for summary adjudication is granted, at the trial of the action, the . . . affirmative defense . . . as to the motion which has been granted shall be deemed to be established and the action shall proceed as to the cause or causes of action . . . remaining." (Code Civ. Proc., § 437c, subd. (n)(1).)

"[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law." (*Harper v. Virginia Dept. of Taxation* (1993) 509 U.S. 86, 96 [125 L.Ed.2d 74, 113 S.Ct. 2510] (*Harper*).) "When [the United States Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule." (*Harper*, at p. 97.) "When this Court does not 'reserve the question whether its holding should be applied to the parties before it,' however, an opinion announcing a rule of federal law 'is properly understood to have followed the normal rule of retroactive application' and must be 'read to hold . . . that its rule should apply retroactively to the litigants then before the Court.' " (*Harper*, at pp. 97–98.) "The Supremacy Clause, U.S. Const., Art. VI, cl. 2, does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law. Whatever freedom state courts may enjoy to limit the retroactive operation of their own interpretations of state law, [citation], cannot extend to their interpretations of federal law." (*Harper*, at p. 100.)

*Harper* could not be more clear, and it obviously applies here. Since *Wallace* therefore also applies here and definitively rejects the sole basis for the federal law delayed accrual rule upon which Schmidlin relied in opposition to the City's summary adjudication motion, the remaining question is whether Schmidlin nevertheless was entitled to prevail on the summary adjudication motion because he established that there were triable issues of fact as to whether his federal excessive force cause of action was timely filed due to state law tolling under Government Code section 945.3.

## C. State Law Tolling Issue

Government Code section 945.3 provides for the tolling of the statute of limitations in certain civil actions related to criminal cases. "No person charged by indictment, information, complaint, or other accusatory pleading charging a criminal offense may bring a civil action for money or damages against a peace officer or the public entity employing a peace officer based upon conduct of the peace officer relating to the offense for which the accused is charged, including an act or omission in investigating or reporting the offense or arresting or detaining the accused, *while the charges against the accused are pending before a . . . court.* [¶] Any applicable statute of

limitations for filing and prosecuting these actions shall be tolled *during the period that the charges are pending before a . . . court*."[7] (Gov. Code, § 945.3, italics added.)

Schmidlin's verified complaint alleged that the excessive force had occurred on March 29, 1997, when he was arrested. The City's summary adjudication motion established several undisputed facts. The criminal complaint was filed on April 18, 1997, charging Schmidlin with various misdemeanor offenses. The criminal charges were ultimately dismissed on December 13, 1999. Schmidlin filed this action on December 12, 2000. The parties agree that the applicable limitations period is one year.

"When the defendant moves for summary [adjudication] on statute of limitations grounds, the defendant bears both the initial burden of production and the burden of persuasion that the limitations period has expired. (Code Civ. Proc., § 437c, subd. (p)(2).) The 'initial burden of production [requires the defendant] to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact.' (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) 'A prima facie showing is one that is sufficient to support the position of the party in question.' " (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 316 [40 Cal.Rptr.3d 313].)

"[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 851.) While the City bore the burden of proving that the one-year limitations period had expired when Schmidlin filed his action (Evid. Code, § 500), Schmidlin bore the burden of proving that the limitations period was tolled under Government Code section 945.3. (*State of Caifornia v. Industrial Acc. Com.* (1961) 195 Cal.App.2d 765, 768 [16 Cal.Rptr. 138] [plaintiff has burden of proving exception to statute of limitations].)

The City's undisputed factual showing in support of its summary adjudication motion satisfied its burden of showing that the one-year limitations period had expired. Schmidlin's federal excessive force cause of action

---

[7] The current version of this statute says "pending before a superior court," but the version in effect at the time of Schmidlin's arrest, before court unification, applied where the charges were pending before a municipal or superior court.

accrued on March 29, 1997. Charges were pending before a court from April 18, 1997, to December 13, 1999. Schmidlin did not initiate his action until December 12, 2000, more than two weeks after the expiration of the limitations period. Since the City satisfied its burden, the burden shifted to Schmidlin to make a showing that there was a triable issue of material fact that precluded summary adjudication.

Schmidlin asserts that the limitations period was tolled from the time of *his arrest*, or no later than April 1, 1997, until the dismissal of the charges. The limitations period is tolled only "during the period that the charges are pending before a . . . court" after the person is "charged by" an "accusatory pleading charging a criminal offense . . . ."[8] (Gov. Code, § 945.3.) In response to the City's summary adjudication motion, however, Schmidlin did not produce *any* evidence that there was a factual dispute about *when* he was charged by an "accusatory pleading" or *when* "charges" were "pending before a . . . court." Schmidlin did not assert that criminal charges were pending at any time prior to the April 18, 1997 filing of the criminal complaint. Indeed, Schmidlin's attorney's declaration in opposition to the City's motion indicated that the April 18, 1997 criminal complaint represented the *initiation* of the charges. Schmidlin's attorney declared that, "a few weeks after Mr. Schmidlin was arrested," the attorney was told that he could not obtain a police report because *"no charges had been filed"* and it was not clear when or if charges would be filed. (Italics added.)

Because the City met its burden in support of its summary adjudication motion and Schmidlin's opposition did not demonstrate that there were any triable issues of material fact with respect to the untimeliness of his federal excessive force cause of action, the City was entitled to prevail on its summary adjudication motion.

Although this should be the end of our analysis, Schmidlin makes several new arguments on appeal that he did not raise in his opposition to the City's summary adjudication motion or at any other time in the superior court. Schmidlin argues that the limitations period was tolled from the time of *his arrest* because a "notice to appear" "had to have been issued to Schmidlin on March 29, 1997," and a notice to appear must have been filed with a magistrate no later than March 31, 1997. Claiming that a notice to appear is an "accusatory pleading" within the meaning of Government Code section 945.3, Schmidlin contends that the entire period between his arrest and the dismissal of charges was tolled under Government Code section 945.3.

---

[8] Schmidlin concedes that he was not charged by an "indictment, information, [or] complaint" (Gov. Code, § 945.3) prior to April 18, 1997.

Schmidlin did not raise his notice to appear theory in response to the City's summary adjudication motion below. "A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715].) This rule applies to both summary judgment motions and trials. (*North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29 [21 Cal.Rptr.2d 104].) However, "[i]f a question of law only is presented on the facts appearing in the record the change in theory may be permitted." (*Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738].)

The questions of *whether* a notice to appear was issued and *if and when* such notice came before a court are not questions of law, but questions of fact. Schmidlin's failure to raise this issue below in response to the City's summary adjudication motion deprived the City of the opportunity to produce evidence that no notice to appear issued or was pending before a court prior to the filing of the criminal complaint on April 18, 1997. It follows that Schmidlin is precluded from adopting this new theory on appeal.

Even if Schmidlin could raise this new theory on appeal, it would fail. The only evidence in the appellate record that Schmidlin cites in support of his appellate factual assertions is evidence that he was booked into jail on March 29, 1997, and released from jail on March 30, 1997. He does not cite to any evidence that a notice to appear issued or was pending before a magistrate at any time. Instead, Schmidlin relies upon inferences that he draws from the misdemeanor docket in his criminal case. The misdemeanor docket was not before the superior court when it ruled on the City's summary adjudication motion, but this court has granted Schmidlin's request for judicial notice of the misdemeanor docket.[9]

The misdemeanor docket reflects that a bail bond in the amount of $3,000 was posted on Schmidlin's behalf on April 1, 1997. No other reference to April 1, 1997, appears in the misdemeanor docket. There is no mention of a notice to appear or of any court filing of charges. Schmidlin argues that the fact that a $3,000 bail bond was posted on April 1, 1997, demonstrates that the "documentation of the charges against Schmidlin were [*sic*] received by the court by April 1, 1997" because the $3,000 bail amount "must have been set by a magistrate," since it exceeds the bail amount listed on the prebooking

---

[9] As a court record, the misdemeanor docket is judicially noticeable (Evid. Code, § 452, subd. (d)), and we may take judicial notice of it even though it was not before the superior court or the trial court. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 306, fn. 2 [46 Cal.Rptr.3d 606, 139 P.3d 2].) However, "any matter to be judicially noticed must be relevant to a material issue." (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 [101 Cal.Rptr.2d 200, 11 P.3d 956].)

information sheet. He asserts that "[t]he court must have had notice of the charges if it had notice of the bail amount, since bail is based on the crimes charged."

Schmidlin's towering stack of inferences collapses under the weight of his own allegation in his *verified* complaint that *"jail officials* arbitrarily raised his bail . . . ." (Italics added.) A party is bound by the allegations in a verified complaint and may not assert contradictory facts in support of a contention that the statute of limitations was tolled. (*Knoell v. Petrovich* (1999) 76 Cal.App.4th 164, 168–169 [90 Cal.Rptr.2d 162].) Schmidlin is bound by his verified allegation and may not now assert that it must have been a magistrate, rather than "jail officials," who set the higher bail amount.

To free Schmidlin from the fetters of his verified allegation, the majority opinion posits that, when Schmidlin alleged that "jail officials" increased the bail amount, he could have been including "a duty judge or commissioner" in "jail officials." (Maj. opn., *ante,* at pp. 755–756, fn. 13.) While it hardly seems likely that Schmidlin's attorney-drafted complaint would have identified a judge or commissioner as a "jail official[]," this attempt to stretch the meaning of Schmidlin's verified allegation serves no purpose. Because the burden shifted to Schmidlin to demonstrate that the City's prima facie showing was undermined by a triable issue of material fact, *he* was obligated to *produce evidence in the superior court* to support his tolling argument. He made no effort to satisfy that burden. Schmidlin's grasping attempts to conjure up factual issues on appeal are out of both place and time. Exactly what Schmidlin may have meant by "jail officials" may remain a mystery to my colleagues, but, by failing to produce evidence below, Schmidlin deprived the City of the opportunity to establish by undisputed evidence precisely who was responsible for setting the bail amount. Schmidlin cannot shift the burden back to the City at this point by making inferences that are, at the very least, seemingly inconsistent with his verified allegations.[10]

At best, these documents support an inference that a notice to appear was issued no later than April 1, 1997, when bail was posted. (See Pen. Code, § 1269b [jail officials must give notice to arrested person of appearance time

---

[10] Schmidlin reasons that the discrepancy between the total of the bail amounts indicated on the prebooking information sheet ($1,050) and the total bail amount listed on the misdemeanor docket ($3,000) *proves* that a *magistrate* must have set his bail. Like his other factual assertions, this evidence was not presented in response to the City's motion, so the City had no opportunity to rebut it. There are numerous possible explanations for the discrepancy. Either one of the documents may have been erroneous, or the nature of the charges may have changed after the preparation of the prebooking information sheet. And the bail amounts listed on the prebooking information sheet obviously did not include various additional fees that a bail bond would have been required to cover.

when releasing person on bail].) Schmidlin did not produce, and cannot point to, any evidence that this notice to appear was filed *with a court.* A notice to appear in a misdemeanor case must be filed by the officer "as soon as practicable," but this filing will be "with the prosecuting attorney," not the court, unless "the prosecuting attorney has previously directed the officer" to file the notice with the magistrate. (Pen. Code, § 853.6, subd. (e).) The prosecutor then has 25 days from the time of the arrest to decide whether to "initiate prosecution by filing the notice or a formal complaint with the magistrate . . . ." (Pen. Code, § 853.6, subd. (e).)

Nothing in the record reflects that the prosecutor had previously directed the officer to file a notice to appear with the magistrate, and the fact that the prosecutor filed a formal complaint within 25 days of the time of the arrest supports a conclusion that the notice to appear was filed with the prosecutor rather than with the magistrate.

Even if I could accept Schmidlin's assertion that a notice to appear *must have been* before a magistrate on April 1, 1997, I would not be able to accept his claim that the notice to appear constituted an "accusatory pleading" within the meaning of Government Code section 945.3 in this case. The majority opinion reasons that limiting "accusatory pleading" to an information, indictment or complaint would render the statute's use of "other accusatory pleading" surplusage. Based on this premise, it concludes that an accusatory pleading necessarily includes a notice to appear or citation for a misdemeanor offense.

It is inconceivable that the Legislature intended for the words "accusatory pleading" to have one meaning in Government Code section 945.3 and a different meaning in the Penal Code, since the Government Code contains no definition of "accusatory pleading" while the Penal Code includes numerous provisions which define and elucidate the meaning of "accusatory pleading." Part 2 of the Penal Code, which deals with criminal procedure and is where one would ordinarily look for the meaning of words describing criminal pleadings, *defines* "accusatory pleading" to "include an indictment, an information, an accusation, and a complaint." (Pen. Code, § 691.) No mention is made of a notice to appear or citation. The Penal Code requires misdemeanors to be prosecuted by *complaint* (Pen. Code, § 740), and the Penal Code identifies the "first pleading" in a misdemeanor prosecution as the *complaint.* (Pen. Code, § 949.) A prosecution for a misdemeanor offense is not "commenced" for criminal statute of limitations purposes until "[a] complaint is filed." (Pen. Code, § 804, subd. (b).) Under the Penal Code, there are limited circumstances under which a notice to appear *may serve as the complaint* and

therefore constitute an accusatory pleading. A notice to appear may *serve as the complaint* only "when filed with the magistrate, *in lieu of a verified complaint*" after the notice to appear has been filed by the officer or the prosecutor with the court. (Pen. Code, § 853.9, subd. (a), italics added.)

The fact that a formal complaint was filed on April 18, 1997, rebuts the notion, in this case, that a notice to appear was filed with a magistrate "in lieu of" a formal complaint. While it is not impossible for a notice to appear to *serve as* the complaint, it can only do so when it is filed "in lieu of" a complaint, and the timely filing of a formal complaint in this case disproves Schmidlin's contention that the notice to appear served as an "accusatory pleading" in this case.

The majority opinion's analysis attempts to read out of Government Code section 945.3 the statutory language requiring that the criminal charges be contained in an accusatory pleading that is "pending before a . . . court" for the statute's tolling provision to apply. Under the facts of this case, Schmidlin failed to satisfy his burden of showing that there were material factual disputes with regard to the application of Government Code section 945.3. He produced no evidence that a notice to appear was filed with a court in lieu of a formal complaint prior to the filing of the formal complaint. Consequently, any tolling under Government Code section 945.3 was insufficient to render his complaint timely, and the City was entitled to prevail on its summary adjudication motion and obtain the dismissal of Schmidlin's federal excessive force cause of action.

## II. Conclusion

The superior court erroneously denied the City's motion for summary adjudication of the federal excessive force cause of action on statute of limitations grounds. The appropriate remedy, in my view, would be to direct the trial court to modify the judgment to eliminate the portion that finds for Schmidlin on the federal cause of action. The damages award is not impacted. The jury awarded $24,000 in damages, which was not allocated between the federal and state causes of action. The fact that Trujillo was found liable for $1,500 in damages proves that the damages were not solely attributable to the federal cause of action. And there was no reason to believe that the jury would have found that Schmidlin suffered different damages from the excessive force than he did from the battery. The two causes of action were based on the same acts. The City did not request that the jury be required to allocate the damages award between the federal and state causes of action even though it was aware that the two were distinguished by the statute of

limitations issue that affected only the federal cause of action. Under the circumstances, the damages award must be viewed as fully attributable to the state law cause of action.[11]

On January 2, 2008, the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied March 12, 2008, S159954. Moreno, J., did not participate therein.

---

[11] Since Schmidlin should not have succeeded on his federal cause of action, he should not have been entitled to an attorney's fees award. The City filed a separate appeal from the attorney's fees award, and I also dissent in that case.